## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ROBERT HOROWITZ,

    Plaintiff,

v.

CROSSROADS ADVISORS,
LLC ET AL.,

    Defendants.

Civil No. 22-00139-BAH

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OPINION

Plaintiff Robert Horowitz ("Plaintiff" or "Horowitz") brings breach of contract and unjust enrichment claims against Alexander Greenberg; Crossroads Advisors, LLC; Crossroads Investments, LP; Crossroads Partners, LP; Crossroads Investments, LLC; and Crossroads Assets, LLC (collectively "Defendants"). ECF 1; ECF 37 (amended complaint). Pending before the Court are Plaintiff's Motion for Partial Summary Judgment to Establish Liability Under Count I ("Plaintiff's Motion"), ECF 161, and Defendants' Motion for Summary Judgment, ECF 164 ("Defendants' Motion"). Both parties filed oppositions, ECFs 164, 169, and replies, ECFs 169, 170. All filings include memoranda of law and exhibits.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Plaintiff's Motion is **DENIED**, and Defendants' Motion is **GRANTED in part** and **DENIED in part**.

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

# I.  BACKGROUND

This case concerns an alleged oral contract between two longtime business contacts and a subsequent business relationship that soured.

## A.  Factual Background

Greenberg is the Founder of Crossroads Partners, LP (the "Fund"), a hedge fund established in 2003. ECF 175-13, at 2 ¶ 2. The Fund has four affiliated corporate entities: Crossroads Advisors, LLC; Crossroads Investments, LP; Crossroads Investments, LLC; and Crossroads Assets, LLC.[2] *Id.* at 3–4 ¶ 12. Greenberg owns and controls each of the entities that manages the Fund. *Id.* at 14 ¶ 12(f). Furthermore, Greenberg "has adhered to a lean operating model, with only a few employees at any given time, and from 2009 through 2011 [Greenberg] worked alone." *Id.* at 8 ¶ 23.

"Since 2005, the Crossroads Entities have three potential revenue streams": (1) The Fund pays Crossroads Investments, LP an annual management fee, *id.* at 4 ¶ 15(a); (2) Crossroads Advisors, LLC earns a 20% incentive fee if "Unaffiliated Assets appreciate in value . . . by the end of the year," *id.* at 5 ¶ 15(b); and Wexford Spectrum ("Wex"), a third-party investment fund that invests capital to be managed by Crossroads Investments, LP also offers an incentive fee to Crossroads Investments, LP equal to 10% of the growth, *id.* ¶ 15(c).

### 1.  Greenberg's and Horowitz's Business Relationship Develops.

Greenberg and Horowitz became acquainted around 1993 or 1994, when Greenberg was introduced to Horowitz's father and, soon after, Horowitz by a colleague. ECF 175-13, at 8 ¶ 25.

---

[2] Crossroads Advisors, LLC "is the General Partner of the Fund." ECF 175-13, at 4 ¶ 12(b). Crossroads Investments, LP "is the management company to which Crossroads Advisors, LLC has delegated the authority to manage and direct the investments of the Fund." *Id.* ¶ 12(c). Crossroads Investments, LLC "is the General Partner of Crossroads Investments, LP." *Id.* ¶ 12(d). Crossroads Assets, LLC "is the Limited Partner of Crossroads Investments, LP." *Id.* ¶ 12(e).

Horowitz's father, Dick Horowitz, owned Insiders Edge ("IE"), a market intelligence publication and research service, *id.* at 8 ¶ 27, that "provides alerts based on reviews of publicly disclosed SEC filings by insiders making trades." *Id.* at 8 ¶ 25. Greenberg restarted his subscription with IE in 2012, which was run by Horowitz after Dick Horowitz's retirement in 2008. *Id.* at 8–9 ¶ 27.

Thus, in 2012, Greenberg became a client of IE, agreeing to pay $25,000 for an annual subscription to IE. *See* ECF 175-2, at 62 (providing a $12,500 invoice for January 1–June 3, 2013, paid semiannually). In 2016, Greenberg offered to increase his fee to $35,000. ECF 175-2, at 91 ("P.S. I am putting through a $10,000 per year increase on my subscription at the next renewal. I hope I can put through more soon."); *see also* ECF 175-2, at 93 (providing an invoice for July 1–December 31, 2017, reflecting the increased semiannual bill of $17,500). Horowitz testifies that Greenberg "hinted at some kind of future collaboration" with Horowitz and "promise[d]" that "when Crossroads got big enough" Greenberg would "make [Horowitz or IE] 'exclusive' or 'at least semi exclusive.'" ECF 175-10, at 2 ¶¶ 3–4. Greenberg denies making such a promise. ECF 175-13, at 9 ¶¶ 29–30,

Towards the end of 2017, Greenberg sought to expand his business' audience and "needed to spend less time on insider analysis and more time on building Crossroads' client base." ECF 175-13, at 9 ¶ 31. Greenberg testifies he "decided to explore the possibility of engaging Insiders Edge to take some of that responsibility away from [him] so that [he] could concentrate on attracting new investors." *Id.* ¶ 31.

On November 30, 2017, Greenberg sent Horowitz an email stating in part:

> Can/should we further expand/integrate our business relationship? More active consulting Partnership? Leave things as they are?

> Crossroads has a long, good track record. It's now marketable (long track-record, clear focus, $65 million in AUM, small team). I have spoken with my four largest investors and believe they will all significantly increase their capital commitments now.

ECF 175-2, at 94.

Greenberg testifies that he "envisioned 2018 as an opportunity to test out an increased consulting relationship before making any longer-term commitments." ECF 175-13, at 10 ¶ 32. He testifies that he "would not consider offering Horowitz an ownership stake in [his] business" without "such a trial period." *Id.* Horowitz, however, testifies that Greenberg made a "specific offer of partnership," ECF 175-10, at 9 ¶ 22, which Horowitz accepted without negotiation, *id.* ¶ 23.

### 2.   Greenberg and Horowitz Discuss Expanding or Integrating their Business Relationship.

After Greenberg's email about integrating their business relationship in November 2017, Horowitz and Greenberg spoke by phone on December 4, 2017, and in person on December 19, 2017. ECF 175-13, at 10 ¶¶ 33–34. It was during these conversations that Horowitz testifies he was offered, and subsequently accepted, the opportunity to become Greenberg's "first investment management partner." ECF 175-10, at 3 ¶ 5; *see also id.* at 9 ¶¶ 22–23.

Specifically, Horowitz alleges that on December 4, 2017, the two spoke by phone and Greenberg agreed to "pursue the partnership option." ECF 161, at 5; *see also* ECF 175-13, at ¶ 33 (agreeing the pair spoke by phone but denying that Greenberg agreed to "pursue the partnership option"). Greenberg and Horowitz met in person on December 19, 2017, to discuss their business relationship. ECF 175-13, at 10 ¶ 34; ECF 175-10, at 3 ¶ 5. The two met in Philadelphia and spent approximately four hours discussing a more integrated business relationship. ECF 175-13, at 10 ¶ 34; ECF 175-10, at 3 ¶ 5; *id.* at 9–10 ¶ 23. Horowitz provides many details from the conversation regarding Crossroads' revenue structure, ECF 175-10, at 3 ¶

6, team structure, *id.* at 3–4¶ 7, investment approach, *id.* ¶¶ 8–9; and short- and long-term strategies and goals, *id.* at 5 ¶¶ 10–11.

Horowitz states that Greenberg made a "specific offer of partnership." *Id.* at 9 ¶ 22. This included a proposal that (1) the Fund's management fees would cover operating expenses, and surpluses would go to future operating expenses; (2) half of the Wex incentive compensation would be a cushion for the operating budget; and (3) any remaining profits (half of the Wex incentive compensation and the incentive compensation from the Fund) "would be split between the partners," with an initial agreement that 80% would go to Greenberg and 20% would go to Horowitz. *Id.* ¶ 22. In other words, in total, Horowitz's share would be 20% of the incentive compensation from the Fund, and 10% of the Wex incentive compensation. Horowitz testifies that Greenberg "said that [Horowitz's] share would only go up, including in 2019, and that there would be a path to full 50% partnership for [Horowitz] upon [Greenberg's] retirement, or sooner." *Id.* ¶ 23. Horowitz states that his partnership would provide Crossroads "customized advice on the advisability of specific potential investments, as well as timing and size of positions along with specific recommendations for Crossroads' asset allocation." *Id.* at 6 ¶ 13 (testifying that IE "does not give investment advice").

In stark contrast to Horowitz's description of the in-person meeting, Greenberg testifies that "[p]artnership was not discussed at this meeting." ECF 175-13, at 10 ¶ 34. Greenberg states the goal of the meeting was "to discuss the potential of additional consulting services on insider trading activity" but that no agreement was reached, other than to continue discussing IE "providing additional services for additional compensation." *Id.* ¶ 34 (noting neither party took notes and neither party shared a written summary afterwards).

Greenberg testifies that:

At no point did I offer Mr. Horowitz, orally or in writing, a partnership stake (either directly or indirectly) in the Crossroads entities, or any type of partnership with me. **Contrary to Horowitz Aff. ¶ 5, I did not offer to make him my "first investment management partner" on December 19, 2017—or at any other time.**

*Id.* ¶ 35 (emphasis in original); *see also id.* at 11 ¶ 39 ("I never made an 'offer of partnership' at the December 19, 2017 [meeting]—or at any other time."). Greenberg denies agreeing to pay Horowitz 20% of the Wex incentive fee" and denies agreeing "that Horowitz would have any interest, directly or indirectly, in the annual Management Fee paid by the Fund to Crossroads Investments, LP.". *Id.* ¶ 40.

Greenberg testifies that "discussions were ongoing as to what the new arrangement would be" in early 2018. *Id.* ¶ 41. On January 5, 2018, Greenberg emailed Horowitz: "I envision us being real economic partners. Together we will craft an arrangement the covers both the joyous upside and the possibility of downside. We need think through the steps now. Starting to think deeply here." *Id.* ¶ 41 (citing ECF 175-2, at 178). Greenberg states that when he used the term "real economic partners," he was "referring to the incentive compensation structure designed to motivate additional insider analysis." *See id.* ("I was not referring to an offer to hand him a portion of my business for free in the near term, and my entire business in the long term for no compensation, as he has alleged.").

By the beginning of February 2018, Greenberg "had agreed to increase [IE's] base fee to $70,000 for the year in exchange for [IE, or Horowitz] providing more analysis of insider behavior." ECF 175-13, at 11–12 ¶ 42. On February 2, 2018, Greenberg emailed Horowitz stating in part, "please invoice [Crossroads] $35,000 for the first six-months of 2018. After I get back f[rom] Florida—will begin work on a term sheet defining this year and beyond." *Id.* at 12 ¶ 43 (citing ECF 175-3, at 68). IE issued two invoices in 2018 to Crossroads Investments, one for

6

January 1–June 30, 2018, in the amount of $35,000, ECF 175-38, at 2, and a second for July 1–

December 31, 2018, in the amount of $35,000, ECF 175-2, at 185.

In addition to the base fee of $70,000 for 2018, Greenberg agreed to an incentive fee,

memorialized in a December 5, 2018, letter. ECF 175-27, at 3. It said:

> This confirms that Crossroads Advisors, LLC ("Advisors") has agreed to
> pay you 20% of the Incentive Fee received by it for 2018 from Crossroads
> Partners, LP and 10% of the Incentive Fee for 2018 received by Advisors from
> the account it manages for [Wex]. We will pay you the foregoing amounts within
> five business days after receipt by Advisors, which we expect to occur during the
> first half of 2019.
> Advisors has previously paid you $70,000 which will not be credited against
> amounts due hereunder....
> Please signify your acceptance to the foregoing and acknowledge that this
> letter represents our only agreement with respect to the subject matter hereof.

ECF 175-13, at 13–14 ¶ 46 (citing ECF 175-27, at 3). Greenberg emailed this to Horowitz with

the Subject: "Letter Agreement—finally attached..." and wrote: "Here's the agreement for this

year. Let me know if anything seems incorrect? Been a hard year, but also been very rewarding

working more closely together. Looking forward to finishing this year and starting again in

2019." ECF 175-27, at 2.

Horowitz executed the agreement and replied:

> Thank you Alex! Of course everything is good and I've signed and attached. I
> was surprised to see this ... while I admit it felt good to open it, as I have
> indicated previously this is a level of formality that I don't feel is necessary—a
> testament to the quality of the relationship and your character. It's a pleasure
> working with you, and I feel very fortunate and truly value our friendship.

*Id.* This was the only written agreement between the parties. Due to the oral nature of the

remaining agreements (*i.e.*, the purported partnership agreement reached on December 19, 2017,

and an agreement about 2019's annual base fee, discussed *infra*), the conduct between the parties

throughout 2018 and into 2019 is relevant to the parties' legal arguments about partnership and

contract formation.

7

### 3. The Parties Dispute Whether Their Conduct in 2018 Constitutes Indicia of Joint Management and Decision Making.

Greenberg testifies that "Horowitz had no authority or control over any decision." ECF 175-13, at 15.   Greenberg testifies that Horowitz never paid any money or made capital contributions to any Crossroads Entities, *id.* ¶ 56; Horowitz did not offer to invest in the Fund and become a Limited Partner therein, *id.* ¶ 57; Horowitz did not know the names of the Fund's Limited Partners, *id.* at 16 ¶ 58, Horowitz never met Greenberg's legal or accounting team, *id.* ¶ 60; Greenberg was the "sole portfolio manager" and had "full control over trading decisions, *id.* ¶ 62; and Greenberg denies that he sought Horowitz's feedback on personnel matters, *id.* at 17 ¶ 66.

Horowitz, by contrast, testifies that on at least one occasion, on February 23, 2018, he provided input on the hiring of Mike Trapanese and "agreed to hire Mike" on a "trial basis." ECF 175-10, at 11–12 ¶ 29. Additionally, Horowitz describes other indicia of his purported co-ownership. For instance, during 2018, Horowitz received a Crossroads email address, ECF 175-3, at 277 (created on or around July 26, 2018), Horowitz was featured on slide decks presented to investors, as a "investor analyst," ECF 175-5, at 77, 296:7–297:15; ECF 175-3, at 206 (highlighting Horowitz as one of five members on the "Crossroads Team"); *id.* at 257 (asking Horowitz "do you want to be, and/or can you be, mentioned in our materials or next quarterly letter? To what extent?"); Horowitz was involved in identifying and procuring a new office space, *see* ECF 175-3, at 228–36 (forwarding Horowitz photographs of a prospective office space); *id.* at 237 (asking Horowitz to "see a potential new office space"); and Horowitz notes that on one occasion he met with experienced investors in Atlanta, and Crossroads paid for his travel and accommodations for this meeting. ECF 175-5, at 62–63, 237:18–238:3; ECF 175-3, at 268–270. Finally, Horowitz received incentive payments for 2018 in 2019, which identified the

8

allocation as "your share of the 2018 profits." ECF 175-3, at 285. These detailed the total "Crossroads share" multiplied by 20% and the total "Wex share" multiplied by (10%) and the total of those two sums combined. *Id.*

### 4. In 2018, There is an Agreement to Keep IE's Compensation at $70,000 in 2019.

Prior to the breakdown in the business relationship between the parties and "[s]ometime near the end of 2018, [Greenberg] offered to keep [IE]'s compensation for 2019 at the same level described in the 2018 Letter Agreement [and] Horowitz agreed." ECF 175-13, at 17 ¶ 69. According to Horowitz this conversation occurred in October 2018. *See* ECF 175-34, at 2 (including email communication sent by Horowitz to Greenberg in March 2019 stating "[i]n October, you said "we'll keep things the same" in 2019 [and] I agreed"). Thereafter, on January 8, 2019, Horowitz emailed, "Per our conversation, attached is the latest invoice. This also confirms our acceptance of your offer to maintain the 2018 compensation formula for 2019." ECF 175-37, at 2. The Invoice attached was for January 1–June 30, 2019, in the amount of $35,000 and was "payable upon receipt of this invoice." *Id.* at 3. It appears from the record that Greenberg did not immediately pay the invoice, as he wished to renegotiate the 2019 fee structure. *See infra* Section I.A.5.

### 5. In 2019, Greenberg Indicates a Desire to Go Back to Their Prior Less Integrated Business Relationship.

By January 2019, the working relationship between Horowitz and Greenberg began to breakdown. *See* ECF 175-13, at 17 (referring to Horowitz as "a distraction"). Greenberg testifies that "[a]t the end of 2018 and into the beginning of 2019, Horowitz became increasingly forceful and quarrelsome regarding [Greenberg's] investment decisions" and Greenberg felt

Horowitz's investment advice was "increasingly colored by his personal desire to maximize incentive fees, and his lack of exposure to potential losses." *Id.* at 17–18 ¶ 70.

Greenberg emailed Horowitz on January 22, 2019, about scheduling an in-person meeting in Philadelphia. ECF 175-39, at 2. Due to scheduling difficulties Horowitz responded in part, writing "[i]t's looking now as though we'll be well into the year before we can get together. Would a written proposal on the business arrangement be feasible instead?" *Id.* Greenberg replied, "[t]he formal framework/document is very important but in my mind follows from a softer understanding and high level agreement on direction. Let's speak when I get back in the office Thursday. I can rally for in person as well. But let's have a good call first." *Id.*

The pair spoke by phone on February 6, 2019. ECF 175-13, at 18 ¶ 74; ECF 175-10, at 12 ¶ 31. Horowitz testifies that Greenberg "clearly stated his intention to terminate the partnership." ECF 175-10, at 12 ¶ 31. Greenberg denies referring to their agreement as a partnership and therefore, denies terminating such a relationship. ECF 175-13, at 28 ¶ 74. The parties "agreed to keep dialogue open and try to negotiate, but [Horowitz] told [Greenberg] [that he] was ending all services unless or until this could be resolved." *Id.*

On February 14, 2019, Greenberg emailed Horowitz to tell him the 2018 incentive payment was in the mail. *See* ECF 175-42, at 2 ("Hi Bob, Everything OK? Are you on vacation—not sure? ... Let me know when you're around to continue to iron out an understanding for both 2019 and beyond that covers both financial and operating issues. I am in Texas (Austin/San Antonio) 2/16-2/20 but am easy reachable.").

Then, on February 28, 2019, Greenberg proposed altering the compensation structure and wrote:

After sorting through all of the cross-currents, I think it is most mutually beneficial if we can continue to productively work together this year (and beyond) –as we have for most of the past 15+ years.

I believe a defined financial arrangement—that we can adjust periodically—will make us both most satisfied and most productive.

For 2019, I propose the following: Base Fee: $50,000 cash (paid semiannually) Incentive Fee: an additional $50,000 if the year-end fund performance is 15% or greater; and a further $100,000 if the year-end fund performance is 20% or greater.

If this is agreeable to you, I will ask our lawyer to draft a contract for your review. This proposal is subject to the execution of a mutually agreeable written contract. Let me know your thoughts.

ECF 175-34, at 4.

Horowitz replied on March 3, 2019, writing "I see no justification for one-way modification to our agreement. *Id.* at 2. He wrote "By objective measures, 2018 was Crossroads' most successful performance in its 15-year existence" and Horowitz wrote that he "frankly d[id] not understand this focus on reducing our piece of the pie." *Id.* at 2–3. Nevertheless, Horowitz wrote "I am open to negotiating reciprocal priorities." *See id.* at 3 ("[W]e remain prepared to resume performance, once the same can be confirmed for Crossroads."). Horowitz wrote that "[h]opefully, we can get our satisfying, productive partnership back on track as soon as possible." *Id.*

Greenberg responded on March 13, 2019:

Currently all of the financial and operational risk and most of the reputational risk resides with me. As I've expressed to you, I want to revert to our prior business relationship. Last year was an experiment. I propose the consulting arrangement we had pre-2018—but have offered to pay quite a bit more than I was paying in the past. Let me know what you think.

*Id.* at 2. Horowitz responded one day later, writing:

We have taken substantial risks. When a money manager utilizes outside research as its core input, the researcher must receive a fair piece of the pie. Last year

11

wasn't an experiment. It was a next step in fulfilling the promise made six years ago to align our compensation accordingly. In October, you said "we'll keep things the same" in 2019. I agreed, and then we performed to the considerable benefit of Crossroads this year. Our agreement is fair, particularly in light of the progress laid-out below. We have also offered reasonable options to address other respective priorities. Let me know. Regards, Bob

*Id.* Finally, Greenberg responded on March 18, 2019:

Based on our email exchanges over the past month or so, it has become clear that you and I are not on the same page about either the past or future. While we have each benefitted from our business arrangement over the past 15 years or so, it is now time for us to discontinue any such relationship. You have not sent us any reports this year and I want to formally advise we no longer want to receive them. I consider you to be fully paid for all prior reports or services and wish you well in your future endeavors.

*Id.*

### B.    Procedural History

Horowitz filed the present suit on January 18, 2022. ECF 1. Horowitz's initial complaint brought two counts: (1) breach of contract; and (2) unjust enrichment. *Id.* at 8–10. Thereafter, on June 13, 2022, Plaintiff filed an amended complaint and added two additional counts: (3) accounting and (4) breach of fiduciary duty. ECF 37, at 12–14. Defendants filed a motion to dismiss, and the Court dismissed Counts III and IV. *See* ECF 49, at 11–12. Additionally, the Court narrowed Count I by concluding that Count I may proceed only against Greenberg, and only under the theory that Horowitz and Greenberg entered into an unincorporated oral partnership agreement. *See id.* at 9–11. Additionally, Count II may proceed only as to compensation for 2019—not for payments allegedly owed in 2018 because a written contract covered the latter payments. *See id.* at 13. The parties filed cross motions for summary judgment, with Horowitz moving for summary judgment on Count I, ECF 161, and Defendants moving for summary judgment on both counts, ECF 164. The motions are fully briefed and ripe for disposition.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court cannot weigh evidence, *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (citing *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659–60 (4th Cir. 2018)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial."

*Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).

Finally, "[w]hen considering cross-motions for summary judgment, the court must consider 'each motion . . . individually' and view 'the facts relevant to each . . . in the light most favorable to the nonmovant.'" *Hunt v. Kadlick*, 972 F. Supp. 2d 772, 775 (D. Md. 2013) (quoting *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003)).

## III.   ANALYSIS

### A.   Maryland Law Applies to Determine the Existence of a Partnership.

"A federal court exercising diversity jurisdiction . . . applies the choice-of-law rules of the state in which it sits." *M.D. Russell Constr., Inc. v. Consol. Staffing, Inc.*, No. 22-1420, 2023 WL 8798086, at *4 (4th Cir. Dec. 20, 2023) (citing *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 599–600 (4th Cir. 2004). Maryland's choice-of-law rules determine which state's substantive law governs the contractual dispute. For contract claims, "Maryland applies the law of the state where the contract was made ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state." *Cotton Patch Cafe, Inc. v. Micros Sys., Inc.*, Civ. No. MJG-09-3242, 2012 WL 13005673, at *3 (D. Md. Apr. 11, 2012) (citing *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 659 A.2d 1295, 1301 (Md. 1995)); *see also Macsherry v. Sparrows Point, LLC*, Civ. No. ELH-15-22, 2017 WL 3315262, at *11 (D. Md. Aug. 3, 2017) (noting "Maryland applies the doctrine of *lex loci contractus* to claims for unjust enrichment" (citing *Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 790 A.2d 720, 728–29 (Md. App. 2002))).

At the motion to dismiss stage, the Court by prior order determined Maryland law applied because Plaintiff's complaint alleged that "[f]inal formation of the agreement at issue and the vast majority of the services provided . . . which establish the causes of action . . . were

completed and performed by [Horowitz] while in . . . Maryland and Montgomery County." ECF 49, at 6–7 (citing ECF 37, at ¶ 2).

While the Court recognizes that parties "may not be able to make appropriate and persuasive choice-of-law arguments without the benefit of discovery" and sometimes such "fact-intensive" arguments warrant deferral to the end of discovery, *M.D. Russell Constr., Inc.*, 2023 WL 8798086, at *3, Horowitz has not alleged that there were new facts shedding light on the choice of law determination that would justify the Court reconsidering its prior determination that Maryland law applies, *see* ECF 161, at 26. Rather, Horowitz argues that under Maryland law, New York law applies. ECF 161, at 26 (citing Md. Code Ann., Corps. & Ass'ns § 9A-106(a)). Horowitz cites the Maryland Revised Uniform Partnership Act ("RUPA"), which states "the law of the jurisdiction in which a partnership has its chief executive office governs *relations among the partners and between the partners* and the partnership." Md. Code Ann., Corps. & Ass'ns § 9A-106(a) (emphasis added). However, application of this section comes only after – and only if – the Court concludes the parties created a partnership. *See id.* Horowitz does not identify any support for § 9A-106(a) governing partnership *formation*. Therefore, in assessing the question of partnership formation, like any oral contract, the Court will apply Maryland law for the reasons articulated by its prior memorandum. ECF 49, at 6–7.

### B.    Maryland Law on the Existence of a Partnership

A partnership is a form of business association, "defined as 'the unincorporated association of two or more persons to carry on as co-owners a business for profit . . . .'" *MAS Assocs., LLC v. Korotki*, 214 A.3d 1076, 1087 (Md. 2019) (quoting Md. Code Ann., Corps. & Ass'ns § 9A-202(a)). RUPA governs such business associations. *Id.* There are no formal requirements for the establishment of a partnership, and they are formed whenever two or more

individuals expressly "intend to form a partnership . . . whether or not the association is called 'partnership,' 'joint venture,' or any other name." *Id.* § 9A-202(a).

"In the absence of formal agreement, 'the existence of a partnership depends on the intent of the purported partners.'" *MAS Assocs., LLC*, 214 A.3d at 1087 (quoting Christine Hurt, D. Gordon Smith, Alan R. Bromberg & Larry E. Ribstein, *Bromberg & Ribstein on Partnership* § 2.04[A], at 2-29 (2d ed. 2019)). Intent to form a partnership can either be proved by "express agreement or inferred from . . . acts and conduct." *Id.* (quoting *Morgart v. Smouse*, 63 A. 1070, 1071 (Md. 1906)). Accordingly, "[t]he existence of a partnership based on the intent of the parties is an issue of fact[.]" *Id.* at 1086. "The existence of a partnership will not be presumed, but must be proved, with the burden of proving such existence resting upon the party having the affirmative of that issue." *Id.* (quoting *Miller v. Salabes*, 169 A.2d 671 (Md. 1961) (internal citations omitted)). In this case, that ultimate burden rests on Horowitz.

In Maryland "any person receiving 'a share of the profits of a business is presumed to be a partner,' unless such share is received in the payment of debt, wages or services rendered, rent, annuity or benefit, interest on a loan, or sale of a business or property." *Id.* at 1087 (quoting Corps. & Ass'ns § 9A-202(d)(1)(3)); *see also Miller*, 169 A.2d at 672 ("The receipt by a person of a share of the profits of a partnership business . . . is prima facie evidence that he is a partner in the business."); *see also id.* ("The probative force of the sharing of profits is not conclusive on the question of the existence of a partnership, but may be rebutted by a showing of fact to the contrary."). Another "factor courts commonly look at to evaluate partnership intent is the management and control of the entity." *MAS Assocs., LLC*, 214 A.3d at 1090 (citing Hurt, Bromberg & Ribstein on Partnership § 2.06[C], at 2-81)). Ultimately, "[t]he evidence demonstrating a partnership must 'rise above surmise or speculation and reach the level of

16

reasonable probability.'" *Id.* at 1087 (quoting *Geo. Bert. Cropper, Inc. v. Wisterco Invs., Inc.*, 399 A.2d 585, 596 (Md. 1979)).

### C.    Plaintiff's Motion for Partial Summary Judgment

Horowitz moves for summary judgment on Count I. ECF 161. To carry his burden, Horowitz must demonstrate that there is no genuine dispute of material fact such that a partnership was formed as a matter of law. Fed. R. Civ. P. 56(a); *Libertarian Party of Va.*, 718 F.3d at 313 ("A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"). Horowitz has not met this burden.

As an initial matter, Horowitz only cites to New York law in his Motion, *see* ECF 161, which the Court finds inapplicable to the question of partnership formation. *See supra* Section III.A. Nevertheless, the Court recognizes that Horowitz is pro se, and that the Court is obligated to construe Horowitz's papers liberally. *See Sadu v. Leland Mem'l Hosp.*, 933 F. Supp. 490, 493 (D. Md. 1996) ("Generally speaking, pro se litigants are held to a less stringent standard than trained attorneys; the Court must afford a pro se complaint generous construction." (emphasis omitted) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972))), *aff'd*, 103 F.3d 120 (4th Cir. 1996); *see also Beaudett v. City of Hampton*, 775 F.2d 1274, 1276 (4th Cir. 1985) ("Though [pro se] litigants cannot, of course, be expected to frame legal issues with the clarity and precision ideally evident in the work of those trained in law, neither can district courts be required to conjure up and decide issues never fairly presented to them."). Accordingly, the Court will construe Horowitz's arguments as asserting a claim under Maryland law to the extent practicable.

Construing Horowitz's arguments as such, Horowitz essentially argues that he has provided sufficient evidence to demonstrate the existence of a partnership, and that he is entitled to judgment on Count I as a matter of law. *See* ECF 161, at 33 ("Facts which cannot be legitimately disputed show that from the beginning of 2018 Greenberg and I had orally agreed to

17

share profits for carrying on the specific undertaking of managing two investment funds and growing that business"). Greenberg argues that material disputes of fact bar summary judgment in Plaintiff's favor on Count I. ECF 164-1, at 28–34. Additionally, Greenberg argues the Court should deny Plaintiff's Motion based on the affirmative defense of fraudulent concealment. ECF 164-1, at 34. Because the Court finds that genuine disputes of material fact preclude summary judgment in Horowitz's favor, the Court need not address Greenberg's alternative argument in the context of Plaintiff's Motion.

As noted above, *see supra* Section III.B, in the absence of a written partnership agreement, a partnership is formed if two or more individuals agree to carry on a business as co-owners. *MAS Assocs., LLC v. Korotki*, 214 A.3d 1076, 1087 (Md. 2019) (quoting Md. Code Ann., Corps. & Ass'ns § 9A-202(a)). The parties dispute whether Greenberg offered to make Horowitz an "investment management partner" at the December 17, 2019, meeting in Philadelphia or at any other time. *Compare* ECF 175-10, at 8–10 ¶¶ 20–23 *with* ECF 175-13, at 10 ¶¶ 34–35. This dispute is material because "[i]n the absence of [a] formal agreement, 'the existence of a partnership depends on the intent of the purported partners.'" *MAS Assocs., LLC*, 214 A.3d at 1087 (quoting Christine Hurt, D. Gordon Smith, Alan R. Bromberg & Larry E. Ribstein, *Bromberg & Ribstein on Partnership* § 2.04[A], at 2-29 (2d ed. 2019)). Expressions of intent to co-own a business, such as those alleged by Horowitz are, therefore, material to the determination of whether the parties formed a partnership.

Horowitz presented evidence that he received "profits" and is therefore presumptively a partner. "Profit is the 'excess of revenues over expenditures in a business transaction.' Whereas revenue is the total 'income from any and all sources.'" *MAS Assocs., LLC*, 214 A.3d at 1095 n.16 (first quoting *Profit*, Black's Law Dictionary (11th ed. 2019), then quoting *Revenue*, Black's

18

Law Dictionary (11th ed. 2019)). According to Horowitz, at the December 19, 2017 meeting it was agreed that (1) the Fund's management fees would cover operating expenses, and surpluses would go to future operating expenses; (2) half of the Wex incentive compensation would be a cushion for the operating budget; and (3) any remaining profits (half of the Wex incentive compensation and the incentive compensation from the Fund) "would be split between the partners," with an initial agreement that 80% would go to Greenberg and 20% would go to Horowitz. ECF 175-10, at 9 ¶ 22. This agreement was eventually memorialized in a December 2019 letter, ECF 175-27, at 3, and reflected that Horowitz would receive "20% of the Incentive Fee received by it for 2018 from Crossroads Partners, LP and 10% of the Incentive Fee for 2018 received by Advisors from the account it manages for [Wex]." *Id.* Pursuant to that agreement, Horowitz eventually received 20% of the Crossroads Partners LP incentive fee and 10% of the Wex incentive fee for 2018. *See* ECF 175-3, at 285 (identifying the allocation as "your share of the 2018 profits").

Greenberg argues that the allocation Horowitz received was merely revenue in payment of a service since no operating expenses were deducted. ECF 164-1, at 32–33. Greenberg does not address Horowitz's claim that the partnership agreement included an agreement that certain revenue streams would strictly cover operating expenses. *See id.* (merely asserting Horowitz has not disputed the calculation of the incentive fees). The Court sees no reason to distinguish as a matter of law between partners that agree to deduct operating expense from one revenue stream exclusively, and partners that agree to deduct operating expenses from total revenue prior to distribution of profits. *See* ECF 164-1, at 32–33 (failing to identify caselaw that would treat these two scenarios differently).

Nevertheless, Greenberg has generated a genuine dispute of material fact by testifying to other evidence that would rebut a presumption of partnership and suggest that Greenberg and Horowitz did not intend to carry on a business for profits as co-owners. *See* ECF 164-1, at 33–34. Greenberg argues that Horowitz made no capital contributions to Crossroads. ECF 164-1, at 33; ECF 175-13, at 15 ¶ 56. Horowitz did not offer to invest in the Fund and become a Limited Partner. *Id.* ¶ 57. Horowitz did not know the names of the Fund's Limited Partners, *id.* at 16 ¶ 58, or ever meet Greenberg's legal or accounting team, *id.* ¶ 60. Additionally, Greenberg testifies he was the "sole portfolio manager" and had "full control over trading decisions. *Id.* ¶ 62. Finally, Greenberg denies that he sought Horowitz's feedback on personnel matters. *Id.* at 17 ¶ 66. In sum, Greenberg argues this course of conduct in 2018 is not consistent with the parties understanding or intending to carry on the business as co-owners. ECF 164-1, at 31–34.

At the same time, Horowitz presents evidence that the relationship between himself and Greenberg was something more than just a consultant. *See* ECF 161, at 27–32. Horowitz had a Crossroads email address, ECF 175-3, at 277, was included on slide decks as part of the team, ECF 175-5, at 77, 296:7–297:15, met with an investor on one occasion in Atlanta and was part of a presentation, ECF 175-5, at 62–63, 237:18–238:3, provided advice on hiring one employee, ECF 175-19, at 11 ¶ 29, and helped pick out office space, ECF 175-3, at 228–37. Horowitz points to statements Greenberg made evidencing an intent to co-own, such as "I envision us being real economic partners," ECF 175-2, at 178 and "I think you and I can accomplish this together," ECF 175-2, at 130 (cleaned up).

Greenberg referred to this 2018 arrangement as "experiment[al]" and indicated he wished to go back to the arrangement pre-2018 where the contact was more limited and Horowitz was just providing services through IE, ECF 175-34, at 2, leading to questions about how Horowitz's

responsibilities differed in 2018. Email communications between Greenberg and Clinton Chang[3] indicate around February 28, 2019, an acknowledgement that Greenberg's offer to change the compensation structure in 2019 was less favorable to Horowitz than the 2018 arrangement. *See* ECF 175-51, at 2 ("[T]hat's probably why he's pissed . . . his awesome deal is on the verge of getting changed. . . .").

These facts and communications suggesting a business relationship that is perhaps more entangled than one would expect from a mere consultant, but perhaps less entangled than an equal partnership, generate a genuine dispute about the type of relationship the parties intended to create. It is worth repeating that summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *Black & Decker Corp.*, 436 F.3d at 442; *Dennis*, 290 F.3d at 644–45. Therefore, Greenberg is correct that there are genuine disputes of material fact that preclude summary judgment in Horowitz's favor. Accordingly, Plaintiff's Motion is **DENIED**.

### D.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment, arguing Count I is barred by the Statute of Frauds, ECF 164-1, at 19–23, and the affirmative defense of fraudulent concealment, *id.* at 34–35, and that Count II is barred by the services contract with Insiders Edge that was, according to Horowitz extended from 2018 into 2019, *id.* at 23–28. The Court finds Defendants' arguments on Count I unpersuasive, and summary judgment as to that Count will be denied. However, the Court will grant summary judgment in favor of Defendants as to Count II.

---

[3] Clinton Chang is identified as an employee of Crossroads in filings from all parties. *See* ECF 161, at 6; ECF 164, at 12 n.10.   He is identified in the Joint Record as "CFA" of Crossroads Investments, LP. ECF 175-2, at 184. Horowitz's responses to interrogatories identify Chang as "a [person . . . having discoverable information that tends to support" Horowitz's position. ECF 175-1, at 2.

### 1. Count I: Breach of Contract

#### i. *Statute of Frauds*

As a reminder, the Court previously narrowed Count I to Defendant Greenberg under the theory that Horowitz and Greenberg entered into an unincorporated oral partnership agreement. ECF 49, at 9–11. Greenberg argues that Count I is barred by the Statute of Frauds. ECF 166, at 19. The Maryland Statute of Frauds states:

> Unless a contract or agreement upon which an action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or another person lawfully authorized by that party, an action may not be brought:
>
> (1) To charge a defendant on any special promise to answer for the debt, default, or miscarriage of another person;
>
> (2) To charge any person on any agreement made on consideration of marriage; or
>
> (3) On any agreement that is not to be performed within 1 year from the making of the agreement.

Md. Code Ann., Cts. & Jud. Proc. § 5-901. *See* ECF 166, at 20 ("[T]he purpose of the statute of frauds is to prevent frauds based upon oral proof of purported contracts." (quoting *Logistics Transp. Co. v. Timber Trucking Co.*, No. 96-2750, 1998 WL 200321, at *2 (4th Cir. Apr. 27, 1998)); *id.* (citing *Carter v. Abramo*, 93 A.2d 546, 548 (Md. 1953)) (same).

Greenberg argues Plaintiff's claim is barred by the Statute of Frauds because it cannot be performed within one year from the making of any purported agreement. *See* ECF 166, at 22 ("It is also undisputed that the alleged partnership had a definite term and could not have been performed within a year."). This argument rests on Horowitz's understanding of the purported partnership agreement in which Greenberg would retire in 2026 and Horowitz would succeed him, with such a retirement date being the "end" of the partnership. *Id.* Horowitz counters that

22

the partnership would not "end" upon a 50% partner retiring—Greenberg would still own 50% and would merely receive profits in retirement. ECF 169, at 15.

In Maryland it is "well established . . . that where there is a [p]ossibility that a contract may be performed within a year the remedy for breach of the contract is not barred by the Statute of Frauds, notwithstanding the fact that the parties might have intended that operation should extend through a much longer period." *Gen. Fed. Const., Inc. v. James A. Federline, Inc.*, 393 A.2d 188, 190 (Md. 1978) (citing *Sun Cab Co. v. Carmody*, 263 A.2d 1, 3–4 (Md. 1970)). There are essentially "two sets of circumstances under which the one-year provision of the Statute of Frauds will bar a claim." *Griffith v. One Inv. Plaza Assocs.*, 488 A.2d 182, 184 (Md. App. 1985). One circumstance occurs where the parties "'expressly and specifically' agreed that their oral contracts were not to be performed within one year." *Id.* (quoting *Sun Cab Co.*, 263 A.2d at 3). Another circumstance occurs "when it is impossible by the terms of the contract for it to be performed fully within one year." *Id.* (citing *Chesapeake Financial Corp. v. Laird*, 289 Md. 594, 600, 425 A.2d 1348 (1981)).

Greenberg's argument, however, rests on the premise that it is "undisputed that the alleged partnership had a definite term." ECF 164-1, at 22. Greenberg points to Horowitz's damage calculations as evidence of Horowitz's assertion that the partnership had a definite term. *See* ECF 175-20, at 13 (reflecting purported damages for lost profits from 2019 through 2033). However, the Court cannot find that it is undisputed that the alleged partnership had a definite term because the details of the purported partnership agreement are very much in dispute. For instance, the fact that Greenberg sent an email terminating their business relationship indicates that Greenberg believed their business relationship was terminable at will. ECF 175-34, at 2 ("While we have each benefitted from our business arrangement over the past 15 years or so, it is

now time for us to discontinue any such relationship."); *see also* Md. Code Ann., Corps. & Ass'ns § 9A-101(k) ("'Partnership at will' means a partnership in which the partners have not agreed to remain partners until the expiration of a definite term or the completion of a particular undertaking."). While Horowitz argues that there were discussions of Greenberg's retirement and Horowitz's succession, viewing the evidence in the light most favorable to Horowitz as the non-movant, there are genuine disputes of material fact as to what the key terms of the contract were—including whether it had a definite end or was terminable at will.[4]  *See* ECF 161, at 12 (arguing "that there would be a path to full 50% partnership for [Horowitz] upon [Greenberg]'s retirement, or sooner" and not that Greenberg's retirement at a particular date was definite, or that Horowitz's ascension to 50% partnership at a particular date was determined).

None of the cases Greenberg cites contain such amorphous oral agreements, and none support application of the Statute of Frauds when the key terms in the oral contract are disputed. Greenberg relies on *Learning Works, Inc. v. The Learning Annex*, 830 F.2d 541, 544 (4th Cir. 1987), a case where parties agreed to a three-year payment scheme for the purchase of assets owned by Learning Works Inc., meaning it could not be completed over one year. ECF 166, at 20–21 (citing *Learning Works, Inc.*, 830 F.2d at 543). This is not similar to the present case, where it is disputed whether the purported agreement was definite in length or terminable at

---

[4] The Court construes Plaintiff, who is pro se, as asserting that a partnership of indefinite duration was created on December 19, 2017. While Plaintiff did testify that they discussed their "goals" for the future and that Mr. Greenberg "only saw himself working another ten years" while Plaintiff wanted to work "for considerably longer, probably until [he] was at least 75," ECF 175-10, at 8–9, ¶ 21, this discussion came before Greenberg allegedly "made his specific offer of partnership to [Mr. Horowitz]." *Id.* ¶¶ 21–22. Additionally, Plaintiff never testifies that an agreement was made to form a partnership for a certain number of years, and never testifies that a 50/50 partnership would be attained at any specific time. *See* ECF 175-6, at 51, 195:2–5 (referring to the 50/50 partnership division as "indeterminate at that time terms"). Further the mere fact that Plaintiff made an estimate of damages that assumed the partnership continued for a number of years does not necessarily mean the parties agreed to a partnership of definite length. *See* ECF 175-20.

24

will.[5] *See supra.* Greenberg also cites *Hernandez v. Woodstock Bar & Grill, LLC*, Civ. No. 18-1582, 2020 WL 705303 (D. Md. Feb. 12, 2020), a case in which the Plaintiff moved to enforce an unexecuted settlement agreement. *Id.* at *2. The unexecuted document provided that the Defendants would pay the settlement amount in twenty-four monthly installments. *Id.* Again, because the agreement expressly required twenty-four monthly installments, by the contract's express terms it could not be completed within one year. *Id.* This case also provides little insight on the application of the Statute of Frauds to a case where there are disputes about whether the agreement was definite in length or terminable at will.[6]

Because the Court determines that there are genuine disputes over the oral contract's terms, including the duration of any such agreement, the Court need not reach Horowitz's argument that as a legal matter that the partnership could have ended in less than a year in the event of extraordinary scenarios such as market crashes.[7] ECF 169, at 15. And because the underlying terms agreed upon, if any, are disputed, the Court cannot say as a matter of law that the contract was impossible to be performed in one year.

---

[5] Although Horowitz and Greenberg agreed to a payment arrangement for both 2018 and 2019, the structure contemplated is not comparable to the one at issue in *Learning Works, Inc.* There, the parties pre-agreed on a price for the entire purchase and then determined that it would be paid off over the course of three years, rendering performance of the contract within one year impossible. *See Learning Works, Inc.*, 830 F.2d at 544. By contrast, in the instant case, the parties did not establish a set payment amount with a predetermined payment schedule; instead, they appeared to contemplate an arrangement that *could* renew and change from year to year but did not *have* to extend beyond the course of the year. Neither party has argued that the payment schedule component of their agreement necessarily imposed a definite term of duration and the Court will not find that it did.

[6] As a general rule, at-will oral partnerships do not come within the Statute of Frauds. *See, e.g.*, J. William Callison and Maureen A. Sullivan, *Partnership Law and Practice: General and Limited Partnerships*, § 5:32 (2024); 37 C.J.S. *Statute of Frauds* § 59 (2024).

[7] Plaintiff incorporates his arguments at ECF 47, at 6. There, Plaintiff cited *Della Ratta v. Broadneck Dev. Corp.*, 410 A.2d 32, 34 (Md. App. 1980) ("The oral agreement alleged in count three was an agreement by the joint venturers to share in the profits and losses arising from the partnership's dealings in land, and, as such, the Statute of Frauds does not apply to it.").

### ii. Fraudulent Concealment

Greenberg argues as an affirmative defense that Horowitz fraudulently concealed material information from Greenberg with the intent to deceive Greenberg. ECF 164-1, at 34. In *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257 (Md. 2007), the Supreme Court of Maryland stated the elements of fraudulent concealment as follows:

> (1) the defendant owed a duty to the plaintiff to disclose a material fact;
>
> (2) the defendant failed to disclose that fact;
>
> (3) the defendant intended to defraud or deceive the plaintiff;
>
> (4) the plaintiff took action in justifiable reliance on the concealment; and
>
> (5) the plaintiff suffered damages as a result of the defendant's concealment.

*Id.* at 274 (quoting *Green v. H & R Block*, 735 A.2d 1039, 1059 (Md. 1999)).

Greenberg identifies various "open judgments against [Horowitz] and his wife, their failure to pay all or part of their federal income tax liability for 2014, 2015, 2016, and 2017, which led to tax liens" and Horowitz's "history of engaging in multiple lawsuits, a number of which he litigated himself" as information that "would have interfered in any role as 'an investment management partner.'" ECF 164-1, at 35.

Greenberg has identified information that would be material to disclose, as Greenberg and his investors might justifiably be concerned about a partner with a history of mismanaging funds being involved in giving advice about how to invest the Limited Partners' funds; *id.*, however, Greenberg has not alleged the final element necessary for the fraudulent concealment defense: that Greenberg suffered damages as a result of Horowitz's concealment. It does not appear from the record that any investor became aware of Horowitz's history or that any negative consequence developed, as 2018 was by all accounts a profitable year for Crossroads. *See* ECF 175-10, at 12–13 ¶ 32; *see* ECF 164-1 (failing to contradict this representation). As Greenberg

26

has not identified any caselaw suggesting the mere risk of harm, as opposed to actual harm, is sufficient to establish a fraudulent concealment defense, the Court must reject Greenberg's affirmative defense.

### 2. Count II: Unjust Enrichment

Under Count II, Horowitz seeks damages for unjust enrichment against all Defendants from January 1, 2018, through March 18, 2019, when he was terminated. ECF 37, at 11–12. The Court by prior order dismissed this claim to the extent that the December 2018 Memorandum demonstrated a contract covering 2018. ECF 49, at 12–15.

A plaintiff seeking to recover on a claim for unjust enrichment must show: (1) a "benefit conferred upon the defendant by the plaintiff"; (2) an "appreciation or knowledge by the defendant of the benefit"; and (3) the "acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007).

An unjust enrichment claim cannot succeed if there was a contract governing the subject matter of the claim, absent a few narrow exceptions.[8] *See Janusz v. Gilliam*, 947 A.2d 560, 567–68 (Md. 2008) ("In Maryland, a claim of unjust enrichment, which is a quasi-contract claim, 'may not be brought where the subject matter of the claim is covered by an express contract between the parties.'" (quoting *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons,*

---

[8] "The court in *Janusz* recognized certain exceptions 'when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual rescission of the contract, when rescission is warranted, or when the express contract does not fully address a subject matter.'" *Monterey Mushrooms, Inc. v. HealthCare Strategies, Inc.*, Civ. No. CCB-20-3061, 2021 WL 1909592, at *3 (D. Md. May 12, 2021) (quoting *Janusz v. Gilliam*, 404 Md. 524, 537 (2008) (internal quotation omitted)). Horowitz does not argue that any of these exceptions apply. *See* ECF 169, at 15–16.

*Inc.*, 747 A.2d 600, 607 (Md. 2000))); *see also Goldstein v. F.D.I.C.*, Civ. No. ELH-11-1604, 2012 WL 1819284, at *6 (D. Md. May 16, 2012) ("[E]stablishment of an actual agreement between the parties would ordinarily defeat an unjust enrichment claim.").

Defendants argue that according to Plaintiff, an oral agreement was reached in October 2018 to continue into 2019 with the same payment structure, and that this oral agreement constituted an agreement to extend the terms of the 2018 contract into 2019, such that a contract for payment of services did cover 2019.[9] ECF 164-1, at 23–26. The Court's prior reasoning applies with equal force now that discovery has confirmed that the 2018 agreement was extended into 2019. *See* ECF 175-37, at 2 (providing invoice on January 8, 2019 that "confirms our acceptance of your offer to maintain the 2018 compensation formula for 2019"); ECF 175-34, at 2 (including email communication sent by Horowitz to Greenberg in March 2019 stating "[i]n October, you said "we'll keep things the same" in 2019 [and] I agreed"). Therefore, Defendants have met their burden to establish a contract covers 2019, and Count II is barred.

Horowitz counters that "[his] unjust enrichment claim is based solely on investment advice—specifically customized asset allocation advice that [he] convinced Greenberg to take in early 2019 and that [Horowitz] show[s] was responsible for all Crossroads profits that year." ECF 169, at 16. The import of this argument is unclear. If Horowitz is arguing that investment advice was beyond the scope of the December 2018 Letter and its subsequent 2019 Extension, that would contradict Horowitz's position that investment advice was the consideration he provided in return for incentive fees that demonstrated a partnership. *See supra* Section III.B. To the extent Horowitz argues that a specific type of investment advice, *i.e.*, customized asset

---

[9] Alternatively, Greenberg argues that no benefit was conferred in 2019, and that Horowitz's Count II should be dismissed for this reason. ECF 164-1, at 26–28. Because the Court finds Greenberg's argument that a contract precludes an unjust enrichment claim to be persuasive, the Court needs not reach Greenberg's alternative argument.

allocation, was outside the agreement, Horowitz has provided no evidence of such. This is particularly true when the December 2018 Letter signed by Horowitz, and thereafter extended in 2019, includes a provision that "this letter represents our only agreement with respect to the subject matter hereof." ECF 175-27, at 3. Accordingly, because Defendants have established that a contract covered January through March 2019, summary judgment is granted in favor of Defendants as to Count II.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is **DENIED**. Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**.

A separate implementing Order will issue.


Dated: <u>September 26, 2024</u>                            <u>         /s/         </u>
                                                      Brendan A. Hurson
                                                      United States District Judge