**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| ROBERT HOROWITZ, | * |
| Plaintiff, | * |
|  | * |
| v. | * |
|  | * Civil No. 22-139-BAH |
| ALEXANDER GREENBERG, | * |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OF DECISION**

This breach of contract action arises from a meeting over a meal between two friends and business colleagues in the City of Brotherly Love. But this famous moniker proved inappropriate as different recollections of what occurred at that lunch ultimately ended a relationship and spawned contested litigation resulting in a bench trial. In short, one meeting participant, Plaintiff Robert Horowitz ("Horowitz") contends that the one-time friends agreed to a partnership, and he has sued to enforce that purported agreement. Defendant Alexander Greenberg ("Greenberg"), the other diner, disputes this assertion. After hearing all the evidence and assessing the credibility of all the witnesses, most notably the two participants in that Philadelphia lunch meeting, the Court concludes that Horowitz has failed to meet his burden of establishing that a partnership was formed. As such, the Court will rule in Greenberg's favor.

Plaintiff Horowitz owns and operates Insiders Edge, LLC ("Insiders Edge"), an investment research firm focused on the "insider discipline," which refers to the study of the correlation between the investment decisions of corporate "insiders" and future stock prices. Through Insiders Edge, Horowitz provided Defendant Greenberg's hedge fund, Crossroads Partners, LP

("Crossroads"), with insider research.    On December 19, 2017, Plaintiff Robert Horowitz ("Horowitz") and Greenberg met for lunch in Philadelphia to discuss the continuation of Insiders Edge and Crossroads' working relationship and the possibility of increased collaboration.  Key to this dispute, Horowitz alleges that Greenberg made Horowitz an offer of partnership at the lunch—an offer that came with an increasing percentage share of Crossroads' profits and Horowitz's inheritance of the hedge fund upon Greenberg's retirement, all without any capital contributions on the part of Horowitz.

The Court held a three-day bench trial on the question of whether there was a partnership formed between Horowitz and Greenberg at that meeting or anytime thereafter and, if so, what the terms of that partnership were.[1]  The parties submitted a proposed pretrial order, ECF 233, and exhibit lists, ECFs 234–36, and a pretrial conference was held on January 6, 2026, *see* ECF 237. The trial began on Tuesday, February 20, 2026 and concluded on Thursday, February 22, 2026. After the trial, the parties submitted proposed findings of fact and conclusions of law.  *See* ECF 251 (joint statement of facts); ECF 252 (Horowitz's proposed findings of fact and conclusions of law); ECF 253 (Greenberg's proposed findings of fact and conclusions of law).  This memorandum sets forth the Court's findings of fact and conclusions of law based upon the evidence and testimony presented at trial.  For the reasons explained below, Horowitz has failed to persuade the Court that a partnership was created at the Philadelphia meeting or anytime thereafter.

---

[1] At the pretrial conference, the Court proposed and the parties agreed to bifurcate the trial, such that the issue of damages would be tried only if Horowitz carried his burden of showing a partnership existed. *See* Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims.").  Because Horowitz has not persuaded the Court that a partnership existed, a second trial on the issue of damages is unnecessary.

Accordingly, judgment will be entered in favor of Greenberg on the sole remaining breach of contract claim.

## I.   FINDINGS OF FACT

### A.   Horowitz and Insiders Edge

Insiders Edge is a family business, or at least it started that way. Around 1979, Horowitz's father "started to compile a database" related to the insider discipline, which Horowitz contributed to "as another part-time job" in high school. ECF 246, at 28, 28:13–17. As Horowitz explained at trial, the insider trading discipline is based in part "on the idea that publicly known information is quickly discounted into stock prices," making it difficult for an investor to "overperform a market index, a benchmark like the S&P 500." *Id.* at 72:7–10. The insider trading discipline "assumes that insiders know things about their company" or "at least understand better their own industry and their own company . . . than outsiders do," and it seeks to exploit this "anomaly," as Horowitz called it, through detailed research and analysis. *Id.* at 72:14–18. Based around that discipline, in 1981 Horowitz's father formed the investment research service Insiders Edge, Inc. *Id.* at 28:18, 29:19–21. Horowitz worked at the company during summers in college, while he pursued a bachelor's degree in business administration and finance. *Id.* at 29:22–30:6. After college, Horowitz followed in his father's footsteps and used his degree to pursue work in investment banking and management for several years. *See id.* at 30:9–23 ("Well, my father had a 22-year career with IBM, and I felt and he felt that I needed that kind of big company training."). Horowitz also became a licensed CPA, although his status is now inactive. *Id.* at 31:21–32:11.

In March of 1992, Horowitz's father fell ill, and Horowitz returned to assist with Insiders Edge, Inc. *Id.* at 34:6–13. Horowitz "took over the sales function" of the company for several years. *Id.* at 36:8–11. At that time, Insiders Edge, Inc. was an independent research service paid primarily by commissions—its institutional clients would subscribe to the research service and

designate a portion of their own commissions on trades to Insiders Edge, Inc.[2] *Id.* at 26:23–37:3. At some point, Insiders Edge, Inc. grew large enough to become a broker-dealer service, meaning that it could "start a broker-dealer affiliate"—essentially a conduit for client stock trades—and "capture a much higher percentage" of commission. *Id.* at 37:6–17.

For Horowitz, the broker-dealer affiliate turned into something more. Horowitz had "some early success investing" money himself and started independently managing the money of some of Insiders Edge, Inc.'s clients. *Id.* at 37:19–38:1. The clients that retained Horowitz apparently liked his "more aggressive" investment style, and in 1997 Horowitz asked if his clients would join him in starting a hedge fund. *Id.* at 38:4–10. A few agreed and in 1998 they launched a hedge fund called Mayflower Partners, LP, which operated for ten years. *Id.* at 38:8–13. Horowitz described a rough first year, followed by varying degrees of success throughout the rest of the hedge fund's operation. *Id.* at 40:21–41:6. He also described his realization during the fund's first year of operation that he did not have the experience needed "in risk management to manage other people's money." *Id.* at 40:23–41:1.

For a time, Horowitz was both operating Mayflower Partners, LP and helping to run his father's business. *Id.* at 44:10–25. At the end of 2004, however, Horowitz left Insiders Edge, Inc. and started his own company, called Insider Intel, which provided services similar to Insiders Edge, Inc. *Id.* at 47:1–24. At some point, Horowitz and his father reunited, and when Horowitz's father retired at the end of 2008, Horowitz took up the family business in full, alongside his brother. *See id.* at 49:2–23. For a year, Insider Intel provided service under both brands, but at the end of

---

[2] By way of example, Horowitz testified that if a client was "paid 20,000 in commission for a stock trade, Insiders Edge could get 12,000 of that, about 60 percent." ECF 246, at 37, 37:3–5.

2009 Horowitz shut down Insider Intel and continued Insiders Edge, Inc.'s services under the name Insiders Edge, LLC. *Id.* at 49:19–23.

### B.    Greenberg and Crossroads

Greenberg began working in the hedge fund industry in 1993. ECF 247, at 132, 348:7–8. Greenberg worked as an analyst and eventually a "partner" at various hedge funds for over a ·decade, and he typically earned an annual salary plus a bonus that constituted a share of the fund's incentive fee. *Id.* at 132–33, 348:17–249:1. Although Greenberg sometimes worked under the title "partner," he had no ownership share in the firms at which he worked.[3] *See id.* at 132–34, .348:25–350:14. At the end of 2002, Greenberg ventured out on his own to start his own hedge fund, Crossroads. *Id.* at 134–35, 350:14–351:20. Greenberg risked $265,000 of his own capital to fund start-up operations and invested "a large part of [his] own personal savings" into the fund itself, along with the capital of investors he had convinced to join him in the venture. *See id.* at 135–36, 351:13–352:1, at 168, 384:16–20. Greenberg has continued to invest his own capital into the fund, which he explained is an important practice in the hedge fund world "from the standpoint of trying to align incentives." ECF 248, at 183, 605:10–11. "Investors want to know that . . . partners have the confidence in their investment abilities and in the fund to put their own money at risk[.]" *Id.* at 183, 605:11–14; *see also* ECF 247, at 177, 393:11–15 ("I am one of the largest partners in the fund. I eat my own cooking every day."); *id.* at 136, 352:2–11 ("[T]he manager eats, sleeps with his partners. So I had my capital committed. If I lose, they lose. They lose, I lose. . . . I have to make up their loss before I can get paid the incentive fee.").

---

[3] Throughout his testimony, Greenberg used the words "firm" and "hedge fund" interchangeably to describe his work experience in the industry. "A 'hedge fund' is a type of investment firm . . . . Hedge funds engage in a diverse array of investing strategies." *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 263 F.R.D. 78, 81 n.4 (D. Conn. 2009).

The corporate structure of many hedge funds is complicated, and Crossroads is no exception. Crossroads Partners, LP—"Crossroads" or the "fund"—is the entity which actually holds client investment assets. *Id.* at 138–39, 354:21–355:15. Crossroads' client investors are called Limited Partners ("LPs"). *Id.* at 139, 355:4–7. Crossroads Advisors, LLC is the Fund's General Partner ("GP"). *Id.* at 139, 355:22–24. Crossroads Investments, LP is the management company to which the GP has delegated management of the Fund's investments. *Id.* at 139–40, 355:25–356:2. Crossroads Investments, LP's GP is Crossroads Investments, LLC, and its LP is Crossroads Assets, LLC. *See* Defendant's Ex. 60 (flowchart of Crossroads' corporate structure).

Since Crossroads' formation, Greenberg has served as the "sole portfolio manager," ECF 247, at 196–97, 412:22–413:1, and he controls all operational matters of the hedge fund and its affiliated entities, *id.* at 140, 356:15–20. Crossroads has grown from $12 million in assets under management in 2003 to over $75 million in the present day. *Id.* at 187, 403:13–15. In 2005, Crossroads also started managing investment capital from another firm, Wexford Spectrum (also know to the parties as "Wexford" or "Wex") in a separate brokerage account. *Id.* at 174, 390:3–14, at 182, 398:1–2.

Crossroads has three revenue streams. *Id.* at 172, 388:18–19; *see also* Defendant's Ex. 60, at 2. The first source of revenue is a management fee paid by the fund to the management company (Crossroads Investments, LP), which equals 1.25% of the fund's assets under management. ECF 247, at 172–73, 388:20–389:1. The management fee is the only assured revenue stream. *Id.* at 173, 389:17. Second is an incentive fee paid by the fund, earned if the fund's assets are up at the end of the year after any prior losses have been recouped. *See id.* at 389:2–24. The incentive fee is equal to 20% of the assets' increase in value if the high-water mark is met, and it is allocated to Crossroads Advisors, LLC's capital account in the fund. *See id.* The "high-water mark" refers to

the point at which the investors' losses have been recovered. *Id.* at 136, 352:8–11 ("Secondly, if I lose, I have to make up their loss before I can get paid the incentive fee. I have to get them back to even, high-water mark they call it."). Third and finally, revenue potential exists in an incentive fee paid by Wexford, also subject to a high-water mark. *See id.* at 173–74, 389:25–390:17. If earned, it is equal to 10% of the assets' increase in value and is paid to Crossroads Investments, LP. *See id.*; Defendant's Ex. 60, at 2.

Because hedge fund managers owe fiduciary duties to their clients and are regulated by the U.S. Securities and Exchange Commission ("SEC"), Crossroads communicates with its clients and the SEC both about what personnel are involved in Crossroads and its management. *See, e.g.*, ECF 248, at 189, 611:8–22. Additionally, Greenberg has a duty as a fiduciary to vet individuals seeking to work for or do business with the Crossroads entities. For example, when Crossroads brought on employees, it screened such personnel with background checks and personality testing. *See, e.g.*, ECF 247, at 153, 369:3–25. Clinton Chang was an analyst at Crossroads who joined as a full-time employee in 2014. *Id.* He was subjected to significant vetting before he joined Crossroads, including "a full background check, criminal, financial, academic records, where he lived," as well as "a psychological profile." *Id.* Crossroads also employed Penelope Carpenter, an executive assistant in investor relations, beginning in early 2017. ECF 248, at 4, 426:6–24. Among other things, Carpenter handled office management and other administrative tasks, such as employee on-boarding. *See id.* at 4, 426:11–22. Crossroads also employed Jason Anderson as a marketing consultant starting in the summer of 2018 until the end of that same year. *See id.* at 146–47, 568:19–569:1. The team was always lean, with Greenberg always at the helm.

Crossroads pays various expenses throughout the year—such as payroll, health insurance, rent, consulting services, and office supplies—using funds from an account held by the

7

management company. *See* Defendant's Ex. 64, at 1–2; ECF 247, at 169, 385:6–15. The consulting services Crossroads paid for included Insiders Edge. *See* ECF 247, at 186–87, 401:16–402:9. If there was a shortfall, Greenberg would contribute additional money to cover operating expenses. *See id.* at 169, 285:11–15. To cover Crossroads' expenses, Greenberg has contributed about $2.3 million to the management company since 2003. *Id.* at 169, 385:3–5. At the start of 2018, the management company had a little over $100,000 in its operating account. *Id.* at 169, 385:6–10.

### · C.    Crossroads and Insiders Edge

Throughout his money managing career, Greenberg utilized insider research and analysis as part of his assessment of potential investments. *See, e.g.*, ECF 247, at 186, 402:4–9. Horowitz and Greenberg first came to know each other when Horowitz was running sales for Insiders Edge, Inc. ECF 246, at 41, 41:9–14. Greenberg was working for a different hedge fund at the time the two first met. *Id.* at 41:14–16. The fund Greenberg was then working for became a client of Insiders Edge, Inc., and Horowitz and Greenberg occasionally discussed the insider discipline together. *Id.* at 42:13–17. Greenberg eventually left that firm and, after working at a few other hedge funds, started Crossroads, as discussed above. *See id.* at 42:25–43:7. It is not clear whether Crossroads immediately became a client of Insiders Edge, Inc., but it appears to have nonetheless benefited from consulting services relatively early on in its history. *See id.* at 48:5–7. After Crossroads was a client, or at least had established a relationship with Insiders Edge, Inc., Horowitz reached out to Greenberg when he started Insider Intel to solicit his business, but Greenberg remained a patron of Horowitz's father. *See id.* at 43:8–10, at 48:2–20.

After Horowitz's father announced his retirement and Horowitz founded Insiders Edge, LLC, Greenberg and Horowitz began interacting again and around the end of 2012, Crossroads was a full-fledged client of Insiders Edge. *Id.* at 50:6–17. At that time, Crossroads paid $25,000

8

per year for the service. *Id.* at 51:9–11. Horowitz described that rate as "on the low end," and recalled only one other client paying an equivalent rate. *Id.* at 51:12–17. The working relationship between Insiders Edge and Crossroads continued for several years, although they never had a written services agreement. *See id.* at 52:14–21; ECF 247, at 187, 403:2–9, at 189, 405:1–5. Crossroads paid an annual rate for research services over the course of the year. ECF 247, at 187, 403:2–7. Insiders Edge issued invoices twice a year, and Crossroads paid in "hard dollars" (by check) and/or "soft dollars" (commission credits paid via Crossroads' broker, "BTIG") depending on the year. *See, e.g., id.* at 180–81, 396:3–397:11. To Crossroads, using hard or soft dollars was helpful in terms of flexibility, but made little difference beyond that. *See id.* at 181, 397:5–7 ("Because it's just money . . . If you run out of soft, you use hard. If you have extra hard and not enough soft, it's fungible.").

At various times throughout Crossroads and Insiders Edge's relationship, Greenberg expressed to Horowitz significant appreciation for his research and an interest in engaging Insiders Edge for continued and additional services in the future. *See, e.g.*, ECF 246, at 52, 52:7–13. In 2017, unsolicited by Horowitz, Greenberg increased Crossroads' rate to $35,000 per year on account of his satisfaction with the services Insiders Edge was providing to Crossroads. *See id.* at 52:14–21.

### D.    2018 Enhanced Services Agreement

Towards the end of 2017, Greenberg was exploring ways to improve Crossroads' investment performance and marketing efforts. ECF 247, at 189, 405:6–20. One idea that emerged was to pursue increased collaboration with Insiders Edge and Horowitz. *See id.* at 190, 406:5–11. On November 29, 2017, Greenberg emailed Horowitz to schedule a call, stating that it was "nothing urgent but working on something I want to tell you about." Plaintiff's Ex. 1, at 2; ECF 246, at 53–54, 53:24–54:12. Horowitz and Greenberg confirmed a date and time for the call, and

Greenberg further explained: "Main topic from my end, can or should we further expand, integrate our business relationship, more active consulting, partnership, leave things as they are." Plaintiff's Ex. 1, at 1; ECF 246, at 54, 54:13–18. Greenberg also sent Horowitz an attachment, which he described as "a high level internal document I prepared to summarize our investment values and performance history." *See* Plaintiff's Ex. 1, at 2; Plaintiff's Ex. 2; ECF 246, at 56–57, 56:19–57:1. This attachment contained information about Crossroads and its performance that Horowitz had not previously known about or had access to. *See generally* ECF 246, at 59–61.

In early December, Horowitz and Greenberg spoke on the phone. *Id.* at 60–61, 60:22–61:2. Horowitz expressed to Greenberg interest in the prospect of greater collaboration between the two and their businesses. *See id.* at 61:3–6. After the call, Horowitz began interacting with Greenberg differently, increasing communication generally and sending additional research alerts to him. *See id.* at 62:8–17. Their new interactions also marked a difference from how Horowitz interacted with other clients of Insiders Edge. *See id.* at 62–66. For example, in addition to discussing general research alerts, Greenberg began informing Horowitz about some of "the trades [Greenberg] was doing" and Horowitz began offering his opinions "about the advisability and timing of trades." *Id.* at 62:23–63:1.

### 1. The Philadelphia Lunch: Greenberg's Version

On December 19, 2017, Horowitz and Greenberg met for lunch in downtown Philadelphia. *Id.* at 66:16–21. They met alone, and neither took notes or presented any documents. *See* ECF 247, at 192–93, 408:20–409:18. At the meeting, Greenberg told Horowitz more about Crossroads' business structure, operations, and revenue streams. *See* ECF 246, at 67, 67:8–70:2, at 78, 78:13–15. Greenberg also used the lunch meeting to get to know Horowitz and Insiders Edge better. *See* ECF 247, at 199, at 415:23–24. Additionally, Greenberg spoke to Horowitz about the marketing

pitches he was developing for Crossroads, on which Horowitz opined. *See* ECF 246, at 77, 77:2–20.

The two then discussed Greenberg's idea for increased collaboration between Insiders Edge and Crossroads, and the effect it might have on Crossroads' business prospects and marketing efforts going forward. *See* ECF 247, at 198, 414:14–22; ECF 246, at 82, 82:8–25. Greenberg described to Horowitz a vision of the future—one which *could* involve Horowitz and/or Insiders Edge joining forces with Greenberg and Crossroads in a manner that extended beyond their current business relationship to varying extents. *See, e.g.*, ECF 246, at 82–83, 82:24–83:5. Looking to the present, however, Greenberg proposed increased collaboration between the two entities under an improved fee structure for 2018, which Greenberg would provide concrete details to Horowitz about in the near future. *See* ECF 247, at 199–200, at 415:23–416:4 ("At the meeting, . . . I said let's try working together under . . . an improved fee structure in 2018 and I'll come back to you with the details of that.").

Specifically, Greenberg offered to double the base amount paid for research services from $35,000 to $70,000 in 2018, and he "offered a piece of the two incentive fee streams, 20 percent of the Crossroads and 20 percent of the Wexford." *Id.* at 198–99, 414:24–415:1. In other words, Greenberg proposed that Horowitz would receive compensation of the "same type . . . that a typical hedge fund employee has," or at least compensation similar to what Greenberg had received during his career in the industry before beginning his own hedge fund. *Id.* at 198, 414:14–20; *see also id.* at 132, 348:10–22 ("Compensation structure was a salary and a bonus. . . . In the beginning it was discretionary, and then as I advanced it was a formula, a percentage of your portfolio's performance."). In return for that improved fee structure, Horowitz would provide Greenberg with insider analysis more frequently and applied to specific positions and trades Greenberg was

11

considering, as well as to the new marketing efforts Greenberg was planning for Crossroads. *See* ECF 246, at 86:20–87:25.

Greenberg also explained to Horowitz that although "he thought Crossroads should be one of the higher paying clients for Insiders Edge given what we were doing," he "wanted the flexibility to pay for it with soft dollars." *Id.* at 88:16–21.  To get a sense of what an appropriate improved fee structure might look like, Greenberg asked Horowitz about what "the best clients of Insiders Edge pay," and Horowitz explained to him Insiders Edge's "structure" and "what kind of pricing was out there for other clients." *Id.* at 89:25–89:4.  Greenberg indicated he would think about the pricing and structure further and "come back with a number on that." *Id.* at 89:1–4. Horowitz agreed to move forward with the proposed arrangement at the meeting, although as Horowitz himself explained at trial, much remained to be finalized, such as the precise amount and form of compensation for the increased and new services. *See id.* at 88, 88:4–12, at 89; *e.g.*, *id.* at 89, 89:5–8 ("Q. So did the two of you agree to a number that day? A. No. But I -- I agreed that it should be based on that process and I wasn't worried about how much it would actually be.").

On January 15, 2018, Greenberg emailed Horowitz with additional details for the emerging new agreement between them: "I envision us being real economic partners. Together we will craft an arrangement th[at] covers both the joyous upside and the possibility of downside. We need [to] think through the steps now. Starting to think deeply here." Plaintiff's Ex. 8, at 1.  Horowitz responded, "Sounds good Alex, thx." *Id.*  On February 2, 2018, Greenberg emailed Horowitz, "After I get back [from] Florida – will begin work on a term sheet defining this year and beyond." Plaintiff's Ex. 13, at 1.  In the same email, Greenberg also requested that Insiders Edge "invoice [Crossroads] $35,000 for the first six-months of 2018." *Id.*  At some point thereafter, the parties finalized the compensation formula that "doubled the base amount from 35 to 70" thousand dollars

12

and "offered a piece of the two incentive fee streams, 20 percent of the Crossroads and 10 percent of the Wexford," as Greenberg had originally proposed. ECF 247, at 198–99, 414:24–415:1. That agreement was not memorialized in writing, however, until December 2018, nearly a year later. *See* Defendant's Ex. 1, at 2.

### 2.    The Philadelphia Lunch: Horowitz's Version

Although the Court does not credit substantial portions of Horowitz's recitation of the Philadelphia lunch, it nevertheless includes his account. According to Horowitz, he and Greenberg met for lunch in Philadelphia in a private room for "about four hours." ECF 246, at 66, 66:20–25. Horowitz described Greenberg as "very well organized" at the meeting and testified that Greenberg "presented all kinds of information about Crossroads' mission, performance, budget, personnel, marketing, [and] plans." *Id.* at 67:4–7; *see also, e.g., id.* at 67:8–70:2. For example, in addition to sharing information about "all the stocks" that Crossroads had, *id.* at 71:14–15, Horowitz also claims that Greenberg "gave [Horowitz] all kinds of information about the contract with the clients," *id.* at 75:18–19.

Horowitz states that after discussing Crossroads in great detail, Horowitz and Greenberg engaged in a discussion about raising capital for the fund. *Id.* at 81:3–5. According to Horowitz, Greenberg had a goal of "raising a hundred million-plus dollars in a matter of months," but Horowitz "didn't see a story" of growth that the hedge fund "could tell right away" to raise that kind of capital. *Id.* at 81:8–15. Instead, Horowitz proposed crafting a story for potential investors based around a partnership between Horowitz and Greenberg, and Horowitz posited that the fund may be able to gain traction if it could point to the partnership as a catalyst for positive trends. *See id.* at 81:16–25 ("Alex is partnering with me, and this is the new performance that we've created, and that would be a way, I felt, to make a pitch that would hit home with some people."). Horowitz

13

believed that to sell that pitch, the fund "needed two years of significantly beating the S&P 500 in a row over any point in the next five years," and Greenberg apparently agreed. *Id.* at 82:4–9.

Horowitz recalls Greenberg stating his desire to "offload some of the responsibilities he had," and that "[t]he most natural fit for that was [Horowitz] handling the insider trading analysis so that [Greenberg] could lighten his load and focus on fundamentals and growing the business." *Id.* at 83:1–7. "And the other thing," according to Horowitz, "was to ultimately monetize Greenberg's investment. Since I was so integral to the secret sauce, it just made sense." *Id.* At that point, Horowitz claims that Greenberg made him an offer for "20 percent partnership, all of the management fees, and [that] half the Wex fee would fund the operations of the business." *Id.* at 84:13–14; *see also id.* at 84:21–85:2 ("[S]o I would get 20 percent of the incentive fee and because half of the Wex incentive fee was going to operations or cushion the operating budget, I would get 20 percent of the remaining half so that would be 10 percent of the total.").

The purported partnership would "combine [Horowitz's] expertise in insider trading with [Greenberg's] expertise in fundamental analysis and risk management and other things to manage and grow the fund Crossroads Partners LP and Wex." *Id.* at 84:14–18. In terms of the partnership's duration, Horowitz recalls Greenberg saying, "'This is the split,' the one I just described, 'for 2018, and it will only go up from here, including in 2019.'" *Id.* at 85:14–17. Finally, Horowitz claims that Greenberg promised that at "the end of that, you know, until I retire, then you'll be equal partner and there'll be a path to very close to equal partner before that if we hit some very aggressive goals." *Id.* at 85:19–22. Horowitz could not recall the particulars of the "aggressive goals" Greenberg purportedly referenced, although Horowitz thought Greenberg "had [provided] more concrete figures in January." *Id.* at 85:25–86:3.

14

Horowitz admits that Greenberg never asked him to buy into the business. *Id.* at 86:4–5. When asked the natural follow-up question to that admission—what he would be bringing to the hedge fund—Horowitz said: "it was my *services*, you know, with the insider trading discipline, fully informed by the research and resources and other resources of Crossroads to manage the two funds." *Id.* at 86:12–15 (emphasis added). Horowitz explained that his contributions would be different than those previously provided by Insiders Edge in two ways: (1) "the wholesale sharing of all of Crossroads' proprietary information" to inform Horowitz's insider research and advice, and (2) "Insiders Edge does provide these top ten lists, usually annually of our best ideas . . . [and Greenberg] now was to get that same information pretty much anytime he wanted and the authorization to share it with clients." *Id.* at 86:20–87:25. Horowitz claims that he accepted Greenberg's "offer" of partnership on the spot. *Id.* at 88:4–7 ("I said that I accepted. And I wanted to make it really clear, so it was kind of like an awkward moment, 'I accept.' . . . I looked at him and gave him the pregnant pause and everything to make sure he understood that.").

## E.    Performance of the 2018 Enhanced Services Agreement

Insiders Edge and Horowitz began providing significant additional services to Crossroads following the Philadelphia meeting and continued to do so throughout 2018. For example, on February 6, 2018, Horowitz emailed Greenberg asking if "it would be helpful" to send "daily reports" and provided a sample of such reports. Defendant's Ex. 39, at 1; ECF 248, at 42, 464:1–12. Although some emails lacked a copyright footer indicating that they were the intellectual property of Insiders Edge, Horowitz typically sent the emails from "@insidersedge.com." Defendant's Ex. 39, at 1. However, some emails sent from Horowitz to Greenberg over the course of 2018 did have the Insiders Edge copyright footer. *See, e.g.*, Plaintiff's Ex. 19; ECF 246, at 135, 135:18. Insiders Edge continued to provide standard research alerts to Crossroads, which were

15

also sent to other Insiders Edge clients. *See* ECF 246, at 87, 87:5–13, at 94, 94:6–15; *see also, e.g.*, Plaintiff's Ex. 11.

Additionally, as contemplated, Greenberg consulted with Horowitz via email and phone about specific positions and trades. *See, e.g.*, Plaintiff's Ex. 17; Plaintiff's Ex. 21. To be sure, Horowitz was putting in many more hours servicing research questions from Greenberg than he ever had before. *See, e.g.*, ECF 247, at 6, 220:17–24 ("I was probably working about 70 hours a week total, . . . like marketing for Insiders Edge, I was able to open up about 20 hours a week to work on Crossroads."). Crossroads was also paying a significantly higher fee to Insiders Edge than it ever had. *See id.* at 198–99, 414:24–415:1 (describing the increase from $35,000 to $70,000 in base pay and the two incentive fees in 2018 Insiders Edge compensation).

Horowitz also provided contributions to Crossroads' marketing materials and attended in-person marketing efforts. *See, e.g.*, ECF 248, at 40, 462:14–24. For example, on May 31, 2018, Chang emailed Horowitz about a "meeting with an existing investor" coming up and asked for Horowitz's "thoughts" on a pitch deck and "any ideas of how to tell a better insider story." Plaintiff's Ex. 26; ECF 246, at 150–51, 150:14–151:16. Horowitz responded with a four-paragraph email containing his thoughts on the pitch deck. *See, e.g.*, Plaintiff's Ex. 26, at 1 ("Slimmer the better probably. If this is an existing investor, I'm not sure they need much of what's in here. . . . What might be good is to have some stock stories like TTD and maybe some others."). Horowitz also suggested that "[Insiders Edge] could . . . at some point present its research alongside, and that could solidify the pitch. But there are issues to work through first, including preparation for handling various scenarios that would likely unfold in meetings if that dynamic were introduced." *Id.* at 1–2.

16

During 2018, Horowitz attended a Crossroads marketing trip in Atlanta, Georgia. ECF 246, at 149, 149:15–22. Shortly after Anderson began working for Crossroads as a marketing consultant, he sent an email sent from Anderson to Greenberg, Chang, and Carpenter including Atlanta presentation materials, which identify Horowitz as an "insider analyst" for Crossroads. Plaintiff's Ex. 27, at 4. However, the next day, Anderson sent Horowitz an initial draft of a pitch deck in PowerPoint format, with a "Crossroads Team" slide indicating "Managing Partner" under both Greenberg's and Horowitz's names. Plaintiff's Ex. 38, at 10. Unlike the boxes associated with the Crossroad employees on that slide, Horowitz's slide is not filled in. *Id.* At trial, Anderson testified that the slide deck was incomplete and that identifying Horowitz as a managing partner was a "mistake" Anderson made because he "likely copied a box and pasted it and it remained in edit." ECF 248, at 158, 580:10–18. Further, Anderson testified that the deck was never sent to any third parties. *Id.* at 158, 580:19–21. Horowitz was not involved in the preparation of those marketing materials. *See* ECF 246, at 156, 156:1–3 ("Q. Do you have any idea how it came to be that this pitch deck listed you as a managing partner? A. I do not."). Later versions of the pitch deck either removed Horowitz, *see* Defendant's Ex. 45; ECF 248, at 55, 477:12–23, or identified him as an "Insider Analyst," *see* Defendant's Ex. 47; ECF 248, at 161, 583:16–24.

Throughout the time Horowitz was providing increased services to Greenberg and Crossroads, Horowitz did not know who all of Crossroads' investors were, nor did he have a direct relationship with investors. *See, e.g.*, ECF 248, at 46–47, 468:25–469:7. At all times, Greenberg was the sole portfolio manager, and only Greenberg had the authority to execute trades. *See* ECF 247, at 182, 398:9–15. Horowitz never had access to the brokerage account. *See id.* at 393:18–19. At no time during Horowitz's increased involvement in Crossroads did he contribute any of his personal capital to the hedge fund or pay any operational expenses of Crossroads. *Id.* at 164–

17

65, 380:25–381:4; *see also id.* at 10, 226:21–24. Neither was Horowitz exposed to any loss. His own money was not invested in the hedge fund at any point, and the variable compensation he was potentially entitled to from the services he provided was just that—a variable incentive fee on top of a base fee paid to Insiders Edge. Moreover, Horowitz had fairly limited interactions with other Crossroads' employees, and both Carpenter and Anderson did not view or treat Horowitz like a partner or boss.[4] *See* ECF 248, at 8, 430:1–14, at 10–11, 432:24–433:3, at 152, 574:2–17. In fact, Carpenter had never seen or spoken to Horowitz prior to her deposition in this case. *Id.* at 12, 434:1–4.

F.     **December 2018 Letter Agreement and Payment**

The agreement setting forth Insiders Edge's incentive compensation for 2018 was reduced to a writing on December 5, 2018 (the "Letter Agreement"). *See* Defendant's Ex. 1, at 2. The same day, Greenberg emailed the following with the Letter Agreement attached to Horowitz:

> Here's the agreement for this year. Let me know if anything seems incorrect? Been a hard year, but also been very rewarding working more closely together. Looking forward to finishing this year and starting again in 2019.

*Id.* at 1. The Letter Agreement itself is addressed to Horowitz from Greenberg on Crossroads letterhead. *Id.* at 2. It states:

> This confirms that Crossroads Advisors, LLC ("Advisors") has agreed to pay you 20% of the Incentive Fee received by it for 2018 from Crossroads Partners, LP and 10% of the Incentive Fee for 2018 received by Advisors from the account it manages for Wexford Spectrum. We will pay you the foregoing amounts within five business days after receipt by Advisors, which we expect to occur during the first half of 2019.
>
> Advisors has previously paid you $70,000 which will not be credited against amounts due hereunder. You acknowledge that Advisors does not receive any Incentive Fee on the partnership accounts listed on Schedule A attached hereto and that you will not be entitled to any compensation with respect thereto.

---

[4] Clinton Chang did not testify at trial, but Horowitz presented no evidence suggesting that Chang treated Horowitz as a partner, manager, or supervisor.

18

> Please signify your acceptance to the forgoing and acknowledge that this letter represents our only agreement with respect to the subject matter hereof.

*Id.* Early in the morning of December 6, 2018, Horowitz responded to Greenberg's email with a signed version of the Letter Agreement attached. *See id.* at 1–2. Horowitz's signature appears under the text, "ACKNOWLEDGED AND AGREED: Insiders Edge, LLC." *Id.* at 2. Horowitz's email reads:

> Thank you Alex! Of course everything is good and I've signed and attached. I was surprised to see this... while I admit it felt good to open it, as I have indicated previously this is a level of formality that I don't feel is necessary- a testament to the quality of the relationship and your character. It's a pleasure working with you, and I feel very fortunate and truly value our friendship.

*Id.* at 1.

As anticipated, on February 14, 2019, on Crossroads Investments, LP letterhead, Greenberg sent Horowitz his "share of the 2018 profits." Plaintiff's Ex. 35, at 1. In total, Horowitz earned $8,962 in incentive fees for 2018—20% of the Crossroads incentive fee ($7,085) and 10% of the Wexford incentive fee ($1,877).

### G.    Disclosures and Payment

Throughout this time, Crossroads never disclosed to the SEC, its investors, or its auditors any partnership with Horowitz. SEC Form ADV requires an entity to "provide information about you and your related persons, including . . . all of your advisory affiliates and any person that is under common control with you," Defendant's Ex. 24, at 12, which would have required identification of either Horowitz or any new partnership, ECF 247, at 143, 359:12–21. Horowitz or any such partnership with him was never disclosed to the SEC in 2018 or 2019. *Id.* at 144, 360:8–17.

Relatedly, Crossroads' contract with its investors requires 30 days' written notice prior to the admission of new general partners. Defendant's Ex. 17, at 34. Crossroads never issued such

19

a notice. ECF 247, at 176, 392:8–15. That contract also requires annual audits by an independent third party, Defendant's Ex. 17, at 53, to whom Crossroads must submit disclosures regarding, among other things, "the identity of the Fund's related parties and all the related party relationships and transactions" and any unrecorded "transactions not in the ordinary course of business," Defendant's Ex. 23, at 4. Horowitz or any new partnership agreement was not disclosed in the audit letter. ECF 247, at 144–45, 360:21–361:11.

Both parties reported payments related to the services Horowitz and Insiders Edge provided in 2018 as non-partnership income. Crossroads Investments, LP booked the incentive payment as a consulting expense in its general ledger. *See* Defendant's Ex. 86, at 9; ECF 248, at 63–64, 485:19–486:1. And for tax purposes, Crossroads issued a Form 1099-MISC for the $8,962 to Insiders Edge, designating it as "miscellaneous income." *See* Plaintiff's Ex. 36. Horowitz accepted that form and never demanded a Form K-1 for himself, which would be necessary to report any partnership income. *See* ECF 247, at 81–82, 297:10–298:3. Horowitz, a CPA, self-prepared his tax returns for the years 2018 and 2019. *Id.* at 78, 294:21–23. Horowitz's personal returns report partnership income only from Insiders Edge, LLC and Mayflower Capital, LLC, not from Greenberg or Crossroads. *See id.* at 79, 295:10–25.

## H.    The 2019 Falling Out

In late 2018, the parties discussed extending the terms of the Letter Agreement into 2019. *See* ECF 248, at 65, 487:15–17. Horowitz sent an email to Greenberg on January 8, 2019, reflecting that the parties had reached an agreement to continue the 2018 compensation formula into 2019. *See* Defendant's Ex. 52, at 1 ("Per our conversation, attached is the latest invoice. This also confirms our acceptance of your offer to maintain the 2018 compensation formula for 2019."). However, the record does not reflect whether Greenberg ever responded to that email, and the invoice was not paid. Around that time, Horowitz and Greenberg's working relationship had

20

begun to deteriorate, at least from Greenberg's perspective. *See, e.g.*, ECF 248, at 65, 487:4–14 ("[Horowitz] amped up his opinions on the market and market direction increasingly as the fund was struggling in the latter part of the year and his potential incentive fee is perhaps going down as well as mine was, and he . . . was uncooperative and Clinton, [was] very uncomfortable with him, and . . . it was not what I was seeking.").

Greenberg sought to change the compensation structure for Insiders Edge going forward, and he and Horowitz's relationship declined significantly as it related to their discussions about future compensation and collaboration. *See id.* at 67, 489:1–5 ("It declined significantly, and when I approached Bob . . . hey, I want to talk about how the compensation was and . . . he's, like, very defensive about this and pretty quickly said, well, I'll cut you off, you're not going to get the insiders information that you want.").

In early 2019, Horowitz sought to meet with Greenberg about their agreement for the coming year. *See* Plaintiff's Ex. 45, at 1. Due to scheduling conflicts, Greenberg proposed "a written proposal on the business arrangement" in lieu of an in-person meeting. *Id.* On January 22, 2019, Horowitz responded, "[t]he formal framework/document is very important but in my mind follows from a softer understanding and high level agreement on direction," and pushed at least a "good call" on the matter. *Id.* Eventually Horowitz and Greenberg spoke on the phone, during which Greenberg described the past year as an "experiment" and expressed interest in "go[ing] back to being a regular Insiders Edge client." ECF 246, at 194, 194:20–23. Horowitz responded by threatening to "stop performing services immediately." *Id.* at 195:1–4.

On February 6, 2019, Greenberg sent Horowitz an email thanking Horowitz for the conversation and noting that he wanted to get "on the same page so there is never disappointment and the greatest chance for success." Plaintiff's Ex. 47, at 1. Nevertheless, Horowitz significantly

reduced the amount of services provided to Crossroads after their exchange. ECF 246, at 195:5–8; ECF 248, at 67, 489:1–14 ("He cut me off. . . . It was, you know, a couple reports came in the beginning of the year, we're not really as active on the phone . . . ."). Emails exchanged between Greenberg and Chang in late February of 2019 reflect an increased commitment to backing away from the "capped incentive/performance drive structure" for Insiders Edge, and also that relations between Greenberg and Horowitz had continued to sour. Defendant's Ex. 55, at 1 ("Absolutely cannot make a good deal with a bad guy.").

The conflict came to a head shortly thereafter. On February 28, 2019, Greenberg proposed the following compensation structure for the remainder of 2019: a base fee of $50,000, paid semiannually, and an incentive fee of an additional $50,000 if the year-end fund performance was 15% or greater, and a further $100,000 if the year-end fund performance was 20% or greater. Plaintiff's Ex. 48, at 3. Horowitz responded that he saw "no justification for a one-way modification to our agreement." *Id.* at 1. In light of what Horowitz believed was the fund's exceptional performance in 2018, Horowitz wrote: "I frankly do not understand this focus on reducing our piece of the pie." *Id.* at 2. But although Horowitz saw "no reason for unilateral changes," he indicated he was "open to negotiating reciprocal priorities. For instance, we would be willing to make the 70k a non-refundable draw in return for an evergreen clause with reasonable notice that recaptures the draw funds (if any) in the event we are terminated." *Id.* In the meantime, Horowitz indicated that "we remain prepared to resume performance, once the same can be confirmed for Crossroads." *Id.*

On March 12, 2019, Greenberg responded that "[c]urrently all of the financial and operational risk and most of the reputational risk resides with me." *Id.* at 1. He reiterated his interest in returning to the "prior business relationship" and again described the past year as an

"experiment." *Id.* On March 13, 2019, Horowitz attempted to rebut Greenberg's characterization: "We have taken substantial risks. When a money manager utilizes outside research as its core input, the research must receive a fair piece of the pie." *Id.* Horowitz also pointed out that Greenberg was going back on an arrangement Horowitz thought they had finalized, stating: "In October, you said 'we'll keep things the same' in 2019. I agreed, and then we performed to the considerable benefit of Crossroads this year." *Id.* On March 18, 2019, Greenberg ended the discussion. Greenberg replied to Horowitz that "[b]ased on our email exchanges over the past month or so, it has become clear that you and I are not on the same page about either the past or future," and stated it was time to "discontinue" their business relationship. *Id.* Noting that Insiders Edge had not sent any reports yet in 2019, Greenberg confirmed that "we no longer want to receive them." *Id.* Greenberg concluded, "I consider you to be fully paid for all prior reports or services and wish you well in your future endeavors." *Id.* Greenberg and Horowitz did not interact again until this lawsuit was filed in 2022. ECF 248, at 71, 493:7–19.

## II.   CREDIBILITY ANALYSIS

In making factual findings after an action is tried without a jury, "the Court must appraise the testimony and demeanor of the witnesses, assess and evaluate the credibility of the witnesses, weigh the evidence, and choose among conflicting inferences and conclusions." *Brooks v. United States*, No. 8:21-CV-01029-TJS, 2023 WL 6599008, at *1 (D. Md. Oct. 10, 2023). In appraising the testimony and demeanor of Horowitz at trial, and in light of the significant amount of evidence presented at trial that contradicts his testimony, the Court does not credit several portions of Horowitz's recitation of the Philadelphia meeting. To be sure, the Court believes, as both men attested, that significant information about Crossroads and details of Greenberg's aspirations related to the business were exchanged that day. But at bottom, the Court finds implausible the assertion that Greenberg offered Horowitz an oral partnership stake in the profits of a multi-

23

million-dollar hedge fund over lunch without so much as asking for any capital contribution on the part of Horowitz.

The facial implausibility of Horowitz's assertion is emphasized by other evidence. Following the Philadelphia meeting, Horowitz did not begin performing the responsibilities one would associate with the partner of a hedge fund (or a hedge-fund adjacent enterprise). He did not possess or act with the authority to make trades, access key accounts, pay expenses, or interact directly with investors. None of the employees associated with Crossroads recall Horowitz as occupying a managerial position in their professional lives. And all evidence presented by Horowitz regarding his and Greenberg's working interactions after the Philadelphia meeting support, or are at least consistent with, the conclusion that Horowitz's role was one of consultant, rather than partner. To be clear, it is certainly possible that Horowitz's recollection of the Philadelphia lunch reflects misinterpretation rather than insincerity. Regardless, the Court does not credit Horowitz's claim that an offer of partnership was made by Greenberg at the Philadelphia lunch or at any time thereafter.

III.    **CONCLUSIONS OF LAW**

The question before the Court is whether Horowitz and Greenberg entered into an unincorporated oral partnership agreement.[5] In the pretrial order, the parties agreed that "the Court's recitation of Maryland law on the existence of a partnership, as set forth on pages 14-17 of the September 26, 2024 Memorandum Opinion (ECF 181) accurately sets forth the elements and burdens of proof related to establishing the existence of a partnership agreement as to

---

[5] At the motion-to-dismiss stage, the Court narrowed the breach of contract claim asserted in Count I to the theory that Horowitz and Greenberg entered into an unincorporated oral partnership agreement. *See* ECF 49, at 6–7. At summary judgment, Greenberg unsuccessfully contended he was entitled to summary judgment as to Count I on the basis of the statute of frauds and the affirmative defense of fraudulent concealment. *See* ECF 181, at 22–26.

24

Plaintiff's breach of contract claim." ECF 233, at 4. At trial, the parties operated under that assumption. However, at the close of Horowitz's case, Greenberg's counsel argued that Horowitz had proceeded on a new theory about where the partnership was formed and that the question required additional briefing to determine whether Maryland or Pennsylvania law should apply. *See* ECF 247, at 117–18.

"A federal court exercising diversity jurisdiction . . . applies the choice-of-law rules of the state in which it sits." *M.D. Russell Constr., Inc. v. Consol. Staffing, Inc.*, No. 22-1420, 2023 WL 8798086, at *4 (4th Cir. Dec. 20, 2023) (citing *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 599–600 (4th Cir. 2004)). Maryland's choice-of-law rules determine which state's substantive law governs the contractual dispute. For contract claims, "Maryland applies the law of the state where the contract was made ('*lex loci contractus*'), unless the parties to the contract agreed to be bound by the law of another state." *Cotton Patch Cafe, Inc. v. Micros Sys., Inc.*, Civ. No. MJG-09-3242, 2012 WL 13005673, at *3 (D. Md. Apr. 11, 2012) (citing *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 659 A.2d 1295, 1301 (Md. 1995)).

At the motion to dismiss stage, the Court determined that Maryland law applied because Plaintiff's complaint alleged that "[f]inal formation of the agreement at issue and the vast majority of the services provided . . . which establish the causes of action . . . were completed and performed by [Horowitz] while in . . . Maryland and Montgomery County." ECF 49, at 6–7 (citing ECF 37, at ¶ 2). At trial, however, Horowitz's testimony is that he accepted the oral partnership agreement at the lunch in Philadelphia, although Horowitz concedes that "other elements of the deal were left for future determination." ECF 252, at 5; *see also, e.g.*, ECF 246, at 88, 88:1–7 (Horowitz testifying that he accepted Greenberg's offer of partnership at the lunch in Philadelphia). The Court will not wade into the issue further, however, because its application of the similar

frameworks for partnership formation in Maryland and Pennsylvania to the facts lead to the same conclusion: no partnership existed here.

## A.    Maryland Law

Under Maryland law, a partnership is a form of business association, "defined as 'the unincorporated association of two or more persons to carry on as co-owners a business for profit . . . .'" *MAS Assocs., LLC v. Korotki*, 214 A.3d 1076, 1087 (Md. 2019) (quoting Md. Code Ann., Corps. & Ass'ns § 9A-202(a)).  Maryland's Revised Uniform Partnership Act ("RUPA") governs such business associations. *Id.*  There are no formal requirements for the establishment of a partnership, and they can be formed whether or not the persons expressly "intend[ed] to form a partnership and whether or not the association is called 'partnership,' 'joint venture,' or any other name." *Id.* § 9A-202(a); *see also MAS Assocs., LLC*, 214 A.3d at 1087 (explaining that express intent is not a *necessary* condition of partnership formation under § 9A-202(a)).

The Supreme Court of Maryland has held that "[i]n the absence of formal agreement, 'the existence of a partnership depends on the intent of the purported partners.'" *MAS Assocs., LLC*, 214 A.3d at 1087 (quoting Christine Hurt, D. Gordon Smith, Alan R. Bromberg & Larry E. Ribstein, *Bromberg & Ribstein on Partnership* § 2.04[A], at 2–29 (2d ed. 2019)).  Intent to form a partnership can either be proved by "express agreement or inferred from . . . acts and conduct." *Id.* (quoting *Morgart v. Smouse*, 63 A. 1070, 1071 (Md. 1906)).  Accordingly, "[t]he existence of a partnership based on the intent of the parties is an issue of fact[.]" *Id.* at 1086.  "The existence of a partnership will not be presumed, but must be proved, with the burden of proving such existence resting upon the party having the affirmative of that issue." *Id.* (quoting *Miller v. Salabes*, 169 A.2d 671, 672 (Md. 1961) (internal citations omitted)).  In this case, that ultimate burden rests on Horowitz.

26

In Maryland "any person receiving 'a share of the profits of a business is presumed to be a partner,' unless such share is received in the payment of debt, wages or services rendered, rent, annuity or benefit, interest on a loan, or sale of a business or property." *Id.* at 1087 (quoting Corps. & Ass'ns § 9A-202(d)(1)(3)); *see also Miller*, 169 A.2d at 672 ("The receipt by a person of a share of the profits of a partnership business . . . is prima facie evidence that he is a partner in the business."); *see also id.* ("The probative force of the sharing of profits is not conclusive on the question of the existence of a partnership, but may be rebutted by a showing of fact to the contrary."). Another "factor courts commonly look at to evaluate partnership intent is the management and control of the entity." *MAS Assocs., LLC*, 214 A.3d at 1090 (citing Hurt, Bromberg & Ribstein on Partnership § 2.06[C], at 2-81)). Ultimately, "[t]he evidence demonstrating a partnership must 'rise above surmise or speculation and reach the level of reasonable probability.'" *Id.* at 1087 (quoting *Geo. Bert. Cropper, Inc. v. Wisterco Invs., Inc.*, 399 A.2d 585, 596 (Md. 1979)).

## B. Pennsylvania Law

Under Pennsylvania law, a general partnership is "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." Pa. Const. Stat. § 8422(a). "A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment . . . for services as an independent contractor or of wages or other compensation to an employee," among other things. *Id.* § 8422(c)(3)(ii). "The formation and existence of a partnership may be demonstrated by evidence surrounding the nature and conduct of parties in their business relationship, and, thus, no written partnership agreement is required to establish the existence of a partnership between the parties." *Est. of Caruso v. Caruso*, 322 A.3d 885, 898 (Pa. 2024). "Consequently, partnership agreements 'may be made orally or may be found to exist by

27

implication from all attending circumstances (i.e., the manner in which the alleged partners actually conducted their business, etc.).'" *Id.* (quoting *Murphy v. Burke*, 311 A.2d 904, 907 (Pa. 1973)).

## C.    Application

The Court concludes that Horowitz has not carried his burden of showing that a general partnership existed between himself and Greenberg. To be sure, Horowitz has presented evidence that a share of the profits Greenberg received from Crossroads was allocated to Insiders Edge. "Profit is the 'excess of revenues over expenditures in a business transaction.' Whereas revenue is the total 'income from any and all sources.'" *MAS Assocs., LLC*, 214 A.3d at 1095 n.16 (first quoting *Profit*, Black's Law Dictionary (11th ed. 2019); and then quoting *Revenue*, Black's Law Dictionary (11th ed. 2019)). For the increased services Insiders Edge provided to Crossroads in 2018, Insiders Edge received a share of Crossroads' 2018 profits—20% of the Crossroads incentive fee and 10% of the Wexford incentive fee, in addition to a non-profit $70,000 base fee, split into two payments. *See, e.g.*, Defendant's Ex. 1, at 1–2; ECF 248, at 42, 464:1–3.

However, Horowitz's presumptive partner status under either Maryland or Pennsylvania law does not follow from that finding of fact for at least two reasons. First, the profits of Crossroads were technically being shared with Insiders Edge, not with Horowitz. In Maryland *"any person receiving* 'a share of the profits of a business is presumed to be a partner,'" with certain exceptions. *MAS Assocs., LLC*, 214 A.3d at 1087 (emphasis added). Horowitz is not the person with which Crossroads' profits were being shared. That is problematic given that his theory of partnership rests on an oral agreement between himself and Greenberg in their individual capacities.[6] Second, under the laws of both states, profit sharing of a business is only presumptive

---

[6] As the Court explained in a prior memorandum opinion, although Horowitz's complaint sufficiently "alleged that he entered into some kind of verbal partnership with Greenberg, he [did]

28

of partnership if the profits were not received in payment for services or made as compensation to an employee. *See* Md. Code Ann., Corps. & Ass'ns § 9A-202(d)(3)(ii) ("A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment . . . [f]or services as an independent contractor or of wages or other compensation to an employee[.]"); Pa. Const. Stat. § 8422(c)(3)(ii) ("A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment . . . for services as an independent contractor or of wages or other compensation to an employee[.]").

Even if Horowitz had received the incentive fee payments directly, the profits received from Crossroads were in exchange for Horowitz's *services* to Crossroads, and to Greenberg, which Horowitz provided as an "independent contractor." *See id.* The evidence presented at trial overwhelmingly supports that conclusion. It is undisputed that Crossroads was founded by and operated entirely under the direction of Greenberg prior to 2018. *See* ECF 247, at 134–35, 350:14–351:20, at 140, 356:15–20, at 196–97, 412:22–413:1. Crossroads was also a long-time client of Insiders Edge leading up to 2018. *See* ECF 246, at 42, 42:13–17, at 48, at 48:5–7. Neither party disputes that an enhanced services agreement came into existence between the two entities in 2018. *See* Defendant's Ex. 1, at 2; ECF 246, at 185–86, 185:15–186:12 ("Yes. This was the payment terms and formula for 2018.").

In executing the terms of the new services agreement, Insider Edge continued to provide reports and alerts to Crossroads, albeit at greater frequency. *See, e.g.*, ECF 246, at 62, 62:8–17.

---

not allege[] sufficient facts to support the conclusion that his agreement included formal membership in any of the LLC Entities or formal partnership in any of the LP Entities." ECF 49, at 8. Accordingly, the Court previously dismissed the breach of contract claims brought against the Crossroad entities that were originally a party to the suit, *id.* at 9, leaving Greenberg as the only Defendant against which the breach of contract claim proceeded.

Horowitz also provided more specialized and responsive insider analysis to Greenberg directly, which was different in kind but directly related in substance to his work at Insiders Edge. *See, e.g., id.* at 62:23–63:1. Although the Court believes Horowitz's assertions that the scope of services he provided to Greenberg and Crossroads in 2018 in this respect were not what he would provide to an ordinary Insiders Edge client, the Court attributes this to the fact that the nature of the agreement between Crossroads and Insiders Edge was not that of an ordinary client. Horowitz's advisement on specific trades was consistent with an insider analyst and consultant role because it was directly related to Horowitz's specialty at Insiders Edge, even though such services departed in frequency and specificity from what was provided to Crossroads before the improved compensation structure was adopted. *Cf. MAS Assocs.*, 214 A.3d at 1091 (holding that even where the parties made "joint business decisions together, including: communicating to the employees together, setting company policy, making hiring and firing decisions, and making decisions regarding salary and bonuses for specific employees," that "sort of behavior [was] equally consistent with the typical high-level managerial duties of" the employee role the alleged partners had enjoyed prior and thus did "not support a finding of an intent to form a partnership").

Horowitz attempts to argue that there was "a very clear distinction between the payment for services to an independent contractor, which was the fixed fee Crossroads paid to Insiders Edge, and the profit sharing that was dependent upon the incentive fees earned by Crossroads due to the partnership's performance," which was "further evidenced by the manner in which Insiders Edge was paid." ECF 252, at 20. Setting aside the fact that this argument acknowledges, as it must, that the incentive fee payment was made to Insiders Edge and not to Horowitz, Horowitz's contention also emphasizes the overlap between the services accounted for by the 2018 Enhanced Services Agreement and those related to the alleged general partnership. That overlap in services

suggests to the Court that all the services provided were done so in execution of the 2018 Enhanced Services Agreement, not in furtherance of any partnership. The Court finds little probative value in how Crossroads was permitted to pay Insiders Edge, and certainly not enough to outweigh the significance of the nature of the services provided.

It is likewise unpersuasive to the Court that Horowitz can point to communications throughout Horowitz and Greenberg's working relationship where the word "partner" or "partnership" was used. *See* ECF 252, at 5, 17, 30; *see also* Plaintiff's Exs. 1, 8, 48. The label assigned to a business relationship is not determinative of the character of that relationship. *See* Md. Code Ann., Corps. & Ass'ns § 9A-202 (noting that a partnership can be created "whether or not the association is called 'partnership,' 'joint venture,' or any other name"); *see also MAS Assocs.*, 214 A.3d at 1091 ("Nor does the use of words like 'partner' or 'owner' magically transform a given association into a partnership."). Moreover, read in context, Greenberg's statements are mainly forward-looking and colloquial. *See MAS Assocs.*, 214 A.3d at 1091 ("For these statements to be meaningful, there should be some consistent mutual expression of partnership, rather than unilateral declarations or informal uses of the word."). Leading up to the Philadelphia meeting, Greenberg asked Horowitz, "Can/should we further expand/integrate our business relationship? More active consulting? Partnership? Leave things as they are?" Plaintiff's Ex. 1, at 1. "Partnership" was presented as an option, not a foregone conclusion. *See id.* Afterwards, Greenberg wrote to Horowitz that he "envision[ed]" the pair as "being real economic partners." *See* Plaintiff's Ex. 8. But consultants can be described as "real economic partners" with

31

their clients just as a pair of general partners can. And Greenberg's use of the word "envision" is telling as it speaks of something not yet realized or finalized.[7] *See id.*

More probative of their business relationship than the labels used to describe it is the actual "nature and conduct" of Horowitz and Greenberg "in their business relationship" throughout 2018 and 2019. *Est. of Caruso*, 322 A.3d at 898; *see also MAS Assocs., LLC*, 214 A.3d at 1090 (noting that "factor courts commonly look at to evaluate partnership intent is the management and control of the entity"). Although Horowitz was providing services that included more specialized insight and advice for particular trades, Horowitz never took on any of Greenberg's operational responsibilities or assumed any of Greenberg's power to execute trades or otherwise access money in the fund. *See, e.g.*, ECF 247, at 182, 398:9–19. At all times relevant to this litigation, Greenberg was Crossroads' sole portfolio manager. The testimony of other individuals working for Crossroads at the time supports that conclusion. Neither Carpenter nor Anderson reported to anyone other than Greenberg, and they both viewed Horowitz as occupying a consultant role. *See* ECF 248, at 8, 430:1–14, at 10–11, 432:24–433:3, at 152, 574:2–17. The weight of the evidence points towards viewing the increased services and communication that flowed between Horowitz and Greenberg throughout the relevant timeframe as Insiders Edge's performance of an enhanced services agreement for Crossroads, not as evidence of a general partnership between two individuals seated at the heads of those organizations.

"Another common factor courts use to determine whether parties intended to form a partnership is whether they made capital contributions to the endeavor." *MAS Assocs.*, 214 A.3d

---

[7] Moreover, in communications with Greenberg about the alleged partnership near the end of their working relationship, Horowitz referred to "us," "our," and "we" when referring to his position in the deal, suggesting that he conceived of the agreement as involving Insiders Edge, not just himself. *See* Plaintiff's Ex. 48, at 1–2. That is the opposite of what one would expect if a person was referring to their position in a partnership that involved just two individuals.

32

at 1093. In the absence of other supportive evidence and confronted with significant evidence contrary to the existence of a partnership, the Court finds implausible a general partnership of the kind Horowitz alleges without compelling evidence that Horowitz made or planned to make a capital contribution to the fund or its operational expenses. The absence of such a contribution in this case significantly damages Horowitz's credibility. As discussed, Greenberg risked $265,000 of his own capital to fund start-up operations of Crossroads and invested "a large part of [his] own personal savings" into the fund itself. ECF 247, at 135–36, 351:13–352:1, at 168, 384:16–20. Greenberg has continued to invest his own capital into the fund, which he explained is an important practice in the hedge fund world for money managers, since it aligns their incentives with that of their clients, the LPs. *See* ECF 248, at 183, 605:10–14; *see also* ECF 247, at 136, 352:2–11, at 177, 393:11–15. In other words, Greenberg is exposed to loss, just as his clients are, based on the investment strategy he executes as the portfolio manager. That premise, at least according to Greenberg, appears to be fundamental to the hedge fund industry.

The theory of general partnership Horowitz pursued at trial would entitle Horowitz to twenty percent of Crossroads' profits in the first year of the partnership, ramping up afterwards and cresting at equal partnership prior to Greenberg's eventual retirement, all without *any* capital contribution on Horowitz's part whatsoever and thus without any exposure to loss. *See* ECF 252, at 4–5. At trial, Horowitz attempted to frame his intellectual property as his capital contribution to the alleged partnership.[8] *See* ECF 247, at 10, 226:1–15; *see also* ECF 252, at 22. However,

---

[8] Horowitz also pointed to "offsetting for the 2019 increase to go toward office space and the bonus pool that was anticipated." ECF 247, at 10, 226:7–9. However, the Court is aware of no evidence, beyond Horowitz's *post hoc* characterizations at trial, that Horowitz ever intended to be equally liable as Greenberg for office space or other operational expenses related to Crossroads. *Cf. MAS Assocs.*, 214 A.3d at 1097 (considering as relevant evidence that tended to show respondent "never intended to be equally liable for the debts of the purported partnership").

33

Horowitz did not actually transfer to Greenberg or Crossroads any intellectual property rights held by himself or by Insiders Edge. Instead, Horowitz's reference to intellectual property refers to the insider research skills Horowitz brought to the table—the very thing that compelled Crossroads to pay for services from Insiders Edge. *See* ECF 247, at 10, 226:10–12 ("I think the other thing I would say is this partnership was my intellectual property and Alex's money management skills. . . . I have things that I am investing in too . . . ."). To be sure, Horowitz's research and advice *was* a thing of value,[9] and his services to Crossroads constituted a form of investment in the fund in a manner of speaking. But the investment of time and energy, while not wholly irrelevant to considering the nature of the parties' relationship, is not ordinarily the kind of capital contributions relevant to evidencing a partnership. *See MAS Assocs.*, 214 A.3d at 1093 (noting that "[u]nderstanding the form of the payments at issue is essential to evaluating their classification as . . . capital contributions" and holding that there were not capital contributions to the alleged partnership where "[t]he alleged partners did not make three separate payments directly into a partnership account, or even directly to" the petitioner-business).

It is plausible that Greenberg persuaded Horowitz to enter the 2018 Enhanced Services Agreement in part by suggesting that success over the next year could lead to a rosier future between both entities or both individuals—a future which may have eventually involved general partnership for Horowitz. But that vision of the future did not come to fruition. The Court is not persuaded, under the applicable burden of proof that rests with Horowitz, that anything more than an agreement for Insiders Edge to provide Crossroads with enhanced services in 2018 was reached at the Philadelphia lunch or anytime thereafter. The Court, as factfinder, simply does not believe

---

[9] In deciding this case, the Court does not opine on whether the 2018 Enhanced Services Agreement appropriately valued Horowitz's skills or Insider Edge's services.

Horowitz's testimony to the contrary.  Accordingly, the Court does not find that a general partnership existed between Horowitz and Greenberg under either Maryland or Pennsylvania law.

## IV.    CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Defendant Alexander Greenberg and against Plaintiff Robert Horowitz.  A separate order of judgment will issue.

Dated: May 26, 2026

           /s/
Brendan A. Hurson
United States District Judge